Tommy Joe DENNISON and Leonard Franklin Dennison, for certain heirs of 23 Kaw Half-Breed Indians, Plaintiffs,

v.

TOPEKA CHAMBERS INDUSTRIAL DE-VELOPMENT CORPORATION, a Kansas corporation, and Security Benefit Life Insurance Company, a Kansas corporation, for all persons claiming an interest in Kaw Half-Breed Reserves 1–23, Shawnee and Jefferson Counties, Kansas, Defendants.

Civ. A. No. 79–1668.

United States District Court, D. Kansas.

Nov. 2, 1981.

J. B. Craig, Bachmann, Arnold, Graybill & Craig, Wichita, Kan., David Burlingame, O'Connor & Hannan, Denver, Colo., for plaintiffs.

Donald R. Newkirk, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., and John C. Christie, Jr., Bell, Boyd, Lloyd, Haddad & Burns, Washington, D. C., for defendants.

## OPINION OF THE COURT

THEIS, District Judge.

Defendants' motion for summary judgment in this case affords the Court an opportunity to journey back in American history and to close the book on another unsalutary volume in the history of the treatment of the Indian people by the white immigrants to this land. Plaintiffs ask the Court to add a final chapter to this saga that, to the plaintiffs at least, would constitute a happy ending. Defendants state that the Court is bound to follow what has already been written and cannot rewrite history at this late date. They ask the Court to add only a postscript affirming the finality of what has already transpired. The Court will offer a condensed version of the established facts to date and then will apply the law to produce the ending that law and policy deem appropriate.

This action is brought by the named plaintiffs on behalf of themselves and others claiming to be the heirs of 23 Kaw (also known as Kansa or Kansas) Indian half-breeds. Half-breed is a term used to denote the offspring of white and Indian parents. The Treaty of 1825 between the United States and the Kaw Indians reserved to each of 23 named half-breed Kaws a one-mile square tract of land. The 23 tracts were along the north bank of the Kansas (Kaw) River. Plaintiffs ask the Court to declare that the heirs of the 23 half-breeds are the owners of "all right, title, interest in and to" the land, which comprises approximately 14,500 acres stretching along the north bank of the Kaw River from North Topeka, Kansas, to east of Perry, Kansas, the classic verbiage of what is known as a quiet title suit, ordinarily a state court cause of action. Plaintiffs argue that the land received by the half-breeds was restricted so that it could not be sold without the permission of the United States. The plaintiffs argue that the tracts granted to the half-breeds were transferred in numerous transactions over the years, were made without the approval of the United States, that such transfers were void, were made under fraud and duress, and that the heirs of the half-breeds are the present true owners of the land.

Defendants make several arguments in support of their motion for summary judgment: (1) The Treaty of 1825 did not place restrictions on alienation on the lands received by the half-breeds; (2) Congress, by legislation in 1860 and 1862, superseded or voided the treaty provision, thus vesting title in the half-breed reservees without restriction, at least as of passage of the 1862 Act; (3) plaintiffs' claims, based on prior transfers of the land, are barred by the statute of limitations; and (4) any claims plaintiffs may have had were extinguished by a 1968 Private Act in which Congress gave money to the heirs of the reservees.

■ The threshold issue is whether the case is suitable for summary judgment. A summary judgment motion cannot be granted if there is a genuine issue of material fact. Summary judgment is a drastic remedy and should be applied with caution. *Redhouse v. Quality Food Sales, Inc.,* 511 F.2d 230, 234 (10th Cir. 1975). The movant must demonstrate his right to prevail beyond a reasonable doubt. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027, 1037 (10th Cir. 1978). Defendants state that there are no issues of material fact, only issues of law as to interpretation of the 1825 Treaty and the subsequent congressional legislation. Plaintiffs argue that the interpretation of the Treaty and statutes are issues of material fact and assert that there are issues of material fact as to the evidence of ownership of the current landholders, such as whether the transfers from the half-breeds were marked with fraud, duress, or other factual indicia of invalidity.

■ The Court believes that the facts as to evidence of ownership are wholly immaterial unless the Court decides to accept plaintiffs' proposed interpretation of the Treaty and statutes. Despite plaintiffs' assertions to the contrary, the interpretation of the Treaty and statutes are questions of law for the Court to resolve. Summary judgment is appropriate when a decision turns on the meaning of words in a statute. *Standard Oil Co. v. Dept. of Energy*, 596 F.2d 1029, 1060 (Em.App.1978); *Mobil Oil Co. v. FEA*, 566 F.2d 87, 92 (Em.App.1978); *Intn'l. Society for Krishna Consciousness v. Rocheford*, 425 F.Supp. 734, 738 (N.D.Ill. 1977). Likewise, "the interpretation of a treaty presents a question of law which is appropriately considered upon a motion for summary judgment." *Upton v. Iran Nat. Airlines Corp.*, 450 F.Supp. 176 (S.D.N.Y. 1976), aff'd., 603 F.2d 215 (2d Cir. 1979). If the Court believed that it required more exposure to the background of this controversy, a trial might be worthwhile. The Court believes, however, that in light of the large amount of uncontroverted historical background material supplied to the Court by the parties, it would be a waste of both judicial and legal resources to hold a trial merely to decide the legal questions in this case.

In sum, then, the Court's opinion and judgment in this case will be based on interpretation of four historical official documents of our government, viz., the 1825 Treaty, the Congressional Acts of 1860 and 1862, and the Congressional Private Act of 1968. The evidence in the case besides these documents will consist of other documentary evidence from governmental archives, which includes official activities of both Congress and the Executive Departments, and Indian archival records, all of which may illuminate the facts and circumstances surrounding the enactment and/or administration of the four principal documents so as to further clarify their intent. The able counsel for all of the parties agree on the authenticity of this evidence.

### THE TREATY OF 1825

The foundation of plaintiffs' claim is the Treaty of 1825 (Appendix A) between the United States and the Kansas Nation, 7 Stat. 244. In Article 1 of the Treaty, the Kaws ceded all of their lands in Missouri and Kansas to the United States. From the cession a tract of land was reserved for the use of the Kansas Nation, in Article 2. The United States agreed to pay the Kansas Nation an annuity and to help provide for the tribes in other respects. Article 6 of the Treaty provided in pertinent part:

"From the lands above ceded to the United States, there shall be made the following reservations, of one mile square, for each of the half breeds of the Kanzas nation, viz: [the half breeds are named] . . . to be located on the North side of the Kanzas river, in the order above named, commencing at the line of the Kanzas reservation, and extending down the Kanzas river for quantity."

Article 11 of the Treaty provided:

"It is further agreed on, by and between the parties to these presents, that the United States shall forever enjoy the right to navigate freely all water courses or navigable streams within the limits of the tract of country herein reserved to the Kanzas Nation; and that the said Kanzas Nation shall never sell, relinquish, or in any manner dispose of the lands herein reserved, to any other nation, person or persons whatever, without the permission of the United States for that purpose first had and obtained. And shall ever remain under the protection of the United States, and in friendship with them."

One question of initial interpretation before the Court is whether the restrictions on land disposition in Article 11 apply to the reservations made in Article 6 for the half-breeds. Defendants contend that the restriction in Article 11 does not apply to the Article 6 lands because the language in Article 11 refers to "the Kanzas Nation" disposing of the land. Since the lands in Article 6 were given not to the Kansas Nation but to the half-breeds, defendants contend, it would be the half-breeds, not the Kansas Nation, who would dispose of the

lands. Thus, they contend, any restriction on the Kansas Nation would not apply.

While defendants' analysis is initially appealing, the Court must exercise caution in deciding the meaning of an Indian treaty on the basis of fine distinctions in language, although as in the law of contracts and interpretation of legislative acts, clarity of language is a paramount factor in determining the intent of the parties. Historical facts in the growth of our country as a sovereign nation, and its related historical principles of law known as stare decisis, have resulted in some fixed axioms of law in this area of legal determination. Indian cessions are not ordinary conveyances, due to the dependent status of the Indians and the often nonconsensual nature of the cessions. Cession treaties must be interpreted as the Indians intended them, and doubtful expressions must be resolved in favor of the Indians. E.g., *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334–35, 25 L.Ed.2d 615 (1976). See Cohen, *Handbook of Federal Indian Law* (1942 ed.), at 37. It must be understood that the best interests of the Indians are not necessarily best served by giving them the broadest power over their lands. Cohen, at 37. See *Starr v. Long Jim*, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (1913).

To determine the understanding of the Indians as a party to an accord, the Court must analyze the prior history, the surrounding circumstances and the subsequent construction of the treaty. See, e.g., *Choctaw Nation v. United States*, 318 U.S. 423, 431, 63 S.Ct. 672, 678, 87 L.Ed.2d 877 (1943). The Court agrees with Felix Cohen's statement that:

"Although an interpretation of a treaty should be made in the light of conditions existing when the treaty was executed, as often indicated by its history before and after the making, the exact situation which caused the inclusion of the provision is often difficult to ascertain. New conditions may arise which could not be anticipated by the signatories to a treaty. A practical administrative construction of a treaty which has long been acquiesced

in by congressional inaction is usually followed by the courts." Cohen, supra, at 37.

The Court notes that while the historical circumstances surrounding the drafting of the 1825 Treaty do not conclusively settle the issue of whether the Article 11 restrictions apply to the Article 6 lands, they do give the Court some guidance. It is known that four of the 23 half-breeds who received lands under Article 6 were grandchildren of White Plume, the leading Kaw chief at the time and the principal Kaw signatory to the treaty. Unrau, *The Kansas Indians*, 34, 118–19 (1971); Miner & Unrau, *The End of Indian Kansas*, 101–102 (1978). It is also known that the Kaws were plagued with tribal factionalism before and after the signing of the Treaty and that White Plume's influence within the tribe tended to ebb and flow. It is known that the granting of land to the half-breeds caused jealousy among many of the Kaws and helped to undermine White Plume's influence and raise the influence of those chiefs who had nothing to do with the half-breeds. H. Miner & W. Unrau, supra, at 101–102; W. Unrau, supra, at 30, 34, 118–119.

With these historical facts before the Court, plaintiffs' argument that the restrictions were intended to help protect the half-breeds as well as the Kansas Nation appears to be sound. The half-breeds apparently needed protection from both the whites and the full blood tribal Kaw Indians, and White Plume appeared interested in doing all he could for the half-breeds. Standing alone, these historical circumstances would not be enough to convince the Court that the Article 11 restrictions apply to the half-breed lands. In conjunction with the clear purpose of the treaty language and the later administrative and judicial interpretations of the Treaty, however, the Court is convinced that the half-breed lands were so restricted.

A comment about the Court's own view of the historical perspective purpose of Article 11 of the Treaty may be in order to explain why it was never repealed nor al-

luded to in the subsequent legislation relevant to this case.

As to Article 11 of the 1825 Treaty, upon which plaintiffs place great reliance, it appears to this Court that such provision was a generic one designed mainly for the benefit of the United States as a contracting party under which the Kansas Nation agreed twofold: first, to the principle of free navigation by anyone on all waters within the reservations of land to both the Kaw nation and the named half-breeds; and second, "never to sell, relinquish, or in any manner dispose of the lands herein reserved, to any other nation, person or persons whatever, without the permission of the United States for the purpose first had and obtained, and shall forever remain under the protection of the United States, and in friendship with them."

Such a provision would appear to be most appropriate for a new and growing nation like the United States living in an era where the nations of England, France and Spain were still retaining parts of the New World, where unbridled conquest or acquisition of foreign lands was a fixed principle in international law, and where each Indian tribe or group of related tribes considered themselves, and were so considered by the United States as well as other foreign nations, as independent nations. The second announced generic purpose of Article 11 was thus to guarantee perpetual national sovereignty and control over the reserved lands, and not as a traditional legal restriction on alienation by individual titleholders except as to anyone asserting sovereignty against the United States.

Such a generic viewpoint of Article 11 in the light of historical circumstances might well seem in accord with the defendants' base contention that the 1825 Treaty never contained a reference to a restriction upon alienation by the half-breed allottees, but only plainly in its words as to "Kansas nation." However, reference to the descriptive words of Article 6, "for each of the half breeds of the Kansas nation," indicates they were a part of the whole Kansas Nation. Likewise, apparently the full blood reservations and 23 half-breed reserves were contiguous to each other, that is, one total reservation area. As stated above, the principle of free navigation applied to all the Kansas Indian reserved land, including that of the half-breeds. The same Article 11 as to the restrictions on disposal must be read as plainly intending to restrict the whole reserved lands. Therefore, using the principle of liberal interpretation of Indian treaties later discussed herein, this Court has no difficulty in reaching the legal conclusion that *all* of the lands reserved in the Treaty required the permission of the United States for disposal or alienation of title. The Court's viewpoint is based also on the scanty administrative and judicial interpretation available. Again, however, in view of the Court's holding as to the effect of the legislative acts of 1860, 1862, and 1968, the Court can agree with defendants' contention that whether or not the 1825 Treaty restrained the right of alienation of the half-breed lands is of little consequence.

Controversy over the type of title held by the half-breeds raged in the 1840's and 1850's as land speculators, squatters, and timber cutters swarmed over the lands in question. W. Unrau, supra, at 138–139, 155–156, 171–178; Plaintiffs' Ex. 1; Defendants' Ex. 5, 7, 9. The efforts by the white settlers to drive the Indian half-breeds off their lands were strenuously resisted by some government officials, notably the Indian agents in the area. W. Unrau, supra, at 171–178. The government officials also resisted efforts by white settlers to have the government state that the half-breed titles had lapsed or that the half-breeds could alienate their land. Plaintiffs' Ex. 1; W. Unrau, supra, at 171–178. Appendix B, referred to in the "Foreword to Appendices" of this opinion and attached hereto, illustrates the mistreatment of the Kansas half-breeds during this pre-Civil War era.

On January 19, 1858, a resolution of the House of Representatives (Defendants' Ex. 8), titled "Kansas Half-Breed Indians," was passed, in which the House requested the opinion of the Secretary of Interior:

"[a]s to the policy or propriety of taking the necessary steps to extinguish the Indian title to all reservations under any treaty with the said Indians in the Territory of Kansas, protecting the rights of the Indians, and of giving said Indians the fee in said land."

In response, the Secretary of Interior wrote:

"In my opinion, it would be proper to authorize the original reservees or their heirs to sell their land, under such restrictions as may be necessary to protect them against fraud, and to secure them a fair price for the land, should they desire to sell. This would be equivalent to granting the fee of the land, and is a measure of relief to which the half-breeds are equitably entitled.

. . . . .

"From all these circumstances it may be fairly inferred that the right of occupancy granted was not designed to be personal merely, but was to exist as a perpetuity in the half-breeds and their descendants. They had all the rights incident to an estate in fee simple, except the right to sell, and this, I think should now be given them." Defendants' Ex. 9.

The administrative construction of the Treaty thus supports the position that the restrictions of Article 11 apply to the Article 6 reservations. The Supreme Court appeared to favor the same position, stating in dicta in *Stephens v. Smith,* 77 U.S. (10 Wall.) 321, 19 L.Ed. 933 (1870), that:

"By the 6th article of the Treaty, there was reserved for the benefit of each of the half breeds named in it (Victoria Smith being one of them), a certain specified allotment of land out of the quantity ceded by the Nation to the United States. The 11th Article contains a stipulation that the Nation shall not sell these lands without permission of the government, and it would seem that the contracting parties intended this prohibition to apply to the individual members of the tribe; for, if it were not so, the policy which dictated the restriction would be in danger of being defeated altogether."

In light of the historical circumstances surrounding the Treaty and the administrative and judicial interpretations of the Treaty, the Court concludes that the Treaty of 1825 did restrict the right of the half-breeds to alienate their lands.

## THE 1860 AND 1862 CONGRESSIONAL ACTS

In 1860, Congress, in an apparent attempt to solve the confusion surrounding the Kansas half-breed lands, passed the following Act, entitled "An Act to settle the Titles to certain Lands set apart for the Use of Certain Half-Breed Kansas Indians, in Kansas Territory."

"Whereas by the sixth article of a treaty made and concluded at the City of St. Louis in the State of Missouri, on the third day of June, eighteen hundred and twenty-five, between the United States of America and the Kansas nation of Indians, there was reserved from the lands ceded by said treaty to the United States by said Kansas nation of Indians, one mile square of land for each of the half-breeds of the Kansas nation named in the said sixth article, which land has been surveyed and allotted to each of the said half-breeds in the order in which they are named in, and in accordance with, the provisions of the said sixth article of said treaty: therefore,

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all the title, interest and estate of the United States is hereby vested in the said reservees who are now living, to the land reserved, set apart and allotted to them respectively by the said sixth article of said treaty; and in case any of the said reservees named in the said sixth article are deceased and leaving heirs, then all the title, interest or estate of the United States to the land allotted to such deceased reservees, is hereby vested and confirmed in such persons as shall by the Secretary of the Interior be decided to be the heirs of such deceased reservees; but, nothing herein shall be construed to give any force, efficacy or binding effect to

any contract, in writing or otherwise, for the sale or disposition of any lands named in this act, heretofore made by any of said reservees or their heirs.

Sec. 2 *And be it further enacted,* That in case of any of the reservees now living, or the heirs of any deceased reservees, shall not desire to reside upon, or occupy the lands to which such reservees or such heirs are entitled by the provisions of this act, the Secretary of the Interior, when requested by them or by either of them to do so, is hereby authorized to sell such lands belonging to those so requesting him, for the benefit of such reservees, or such heirs; and the Secretary of the Interior is also authorized to sell, with the assent of the Kansas nation of Indians the lands allotted to the reservees who are deceased leaving no heirs for the benefit of the living reservees, their heirs and the heirs of those deceased, equally; said lands to be sold in accordance with such rules and regulations as may be prescribed by the Commissioner of Indian Affairs, and approved by [the] Secretary of the Interior; and patents in the usual form shall be issued to the purchasers of said lands, in accordance with the provisions of this act.

Sec. 3 *And be it further enacted,* That the proceeds of the land, the sale of which is provided for by this act, shall be paid to the parties entitled thereto, or applied by the Secretary of the Interior for their benefit, in such manner as he may think most advantageous to their interest."

This Act clearly restricted the right of the half-breeds to alienate their land, as the land could only be sold by the Secretary of the Interior. Congress also emphasized that the Act gave no force or legal sanction to any prior disposition of the land. If the 1860 Act had been the last pronouncement by Congress on the subject, it is clear that any transfers by the half-breeds after 1860 not undertaken by the Secretary of the Interior under the scheme in the 1860 Act would be void and the land would legally belong to the heirs of the half-breeds. This was the interpretation of the 1860 Act given by the Supreme Court in *Stephens v. Smith,* wherein the court declared that a land deed dated August 14, 1860, which purported to convey a tract from a half-breed was void. The Court said:

"There is no ambiguity in the Act, nor is it requisite to extend the words of it beyond their plain meaning in order to arrive at the intention of the Legislature. It was considered by Congress to be necessary, in case the reservees should be desirous of relinquishing the occupation of their lands, that some method of disposing of them should be adopted which would be a safeguard against their own improvidence. . . . It was, manifestly, the purpose of Congress, in conferring the authority to sell (on the Secretary of the Interior), to save the lands of the reservees from the cupidity of the white race."

*Stephens v. Smith,* 77 U.S. (10 Wall.) 321, 19 L.Ed. 933 (1870).

After the passage of the Act of 1860, the Secretary of the Interior appointed two men, W. H. Walsh and William H. Coombs, to carry out the mandate of Congress to determine the status of the reservees and their heirs. On May 20, 1862, after the reports of the two men were submitted to the Secretary of the Interior, the Senate passed a resolution directing the Secretary to send it copies of the reports. The Secretary did so on June 3, 1862, and also sent to the Senate a letter in which he stated:

"[T]here is a large number of settlers upon portions of the land, some of whom have made improvements. These settlers claim that they have a right to purchase the lands. This department cannot recognize such a claim under the existing law, and, unless Congress shall interpose by some new legislation, it only remains to execute the act of Congress above referred to, by deciding who are the heirs of the deceased reservees, and perfecting their titles."

Defendants' Ex. 13.

Congress responded by considering a joint resolution (S.98), reported out by the Senate

Committee on Indian Affairs on July 20, 1862, to repeal sections two and three of the Act of 1860, and as much of section one as authorized the Secretary to determine the heirs of the reservees. The sponsor of S.98, Senator Doolittle, said:

"I am directed by the committee on Indian Affairs, to whom the subject was referred, to report a joint resolution in relation to a certain act concerning title to lands set apart for the use of the half-breed Kansas Indians in Kansas Territory, and it is necessary that there should be immediate action upon it; for there may result such a decision on the part of the Secretary of the Interior, based upon *ex parte* testimony, as may affect the titles of a great many persons. . . . The committee were unanimous in supporting this resolution."

*Cong. Globe*, 37th Cong., 2nd Sess. 3324 (1862). S.98 passed the Senate on July 14, 1862, and was passed with an amended title in the House on July 15, 1862. The Senate concurred in the House amendment on July 16 and the joint resolution was enrolled and signed July 17, 1862. It reads as follows:

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That sections two and three of an act entitled 'An act to settle the titles to certain lands set apart for the use of certain Half-breed Kansas Indians in Kansas Territory,' approved May twenty-six, one thousand eight hundred and sixty, and so much of the first section as authorizes the Secretary of the Interior to decide what persons are heirs to deceased reservees as mentioned therein be and the same are hereby, repealed."

Defendants contend that the effect of the 1860 Act and the 1862 Joint Resolution, when read together, was to grant the half-breeds full title to the lands reserved to them by the 1825 Treaty, with no restrictions on alienation. They point to administrative and judicial interpretations which support their view. Plaintiffs contend that the legislation fails to change the provisions of the 1825 Treaty restricting alienation,

especially since no reference was made in either legislative act to Article 11 of the Treaty which had imposed the restriction on disposition of any of the Treaty land. Plaintiffs rely on a large body of case law setting high standards to be met before it can be said that Congress has abrogated Indian treaty rights. Both arguments have merit in legal foundation.

■ It is unquestioned that Congress has the power to amend or completely abrogate Indian treaties. E.g., *DeCoteau v. District County Court for Tenth Jud. Dist.*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). While Congress has the power to abrogate Indian treaties, the courts are frequently called upon to determine whether or not Congress has in fact abrogated part or all of a particular treaty. In so determining, the courts have been disposed to protect Indian treaty rights from what the Supreme Court has termed abrogation in "a backhanded way." *Menominee Tribe v. United States*, 391 U.S. 404, 412, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). There is an element of truth in the statement that:

"[T]he body of law protecting basic Indian treaty rights is in evident disarray. There are so many tests for determining whether an abrogation has been effected, and most of them are so vague, that a court has little recourse but to arrive at an ad hoc, almost arbitrary decision when faced with the question of whether a particular treaty guarantee has been abrogated by Congress."

Wilkenson & Volkman, *Judicial Review of Indian Treaty Abrogation*, 63 Cal.L.Rev. 601 (1975).

While there are a number of formulations extant as to how the Court should determine if an abrogation has been effected, the Court does not share the despair of Wilkenson & Volkman as to the Court's ability to reach a principled decision. While the language varies, all the formulations offer a good deal of protection to the Indians.

■ The Supreme Court has said that "the intention to abrogate or modify a treaty is not to be lightly imputed to Congress." *Menominee Tribe of Indians v.*

*United States,* supra. A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed. *Cook v. United States,* 288 U.S. 102, 120, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933); *United States v. Winnebago Tribe of Nebraska,* 542 F.2d 1002 (8th Cir. 1976). A later Act of Congress should be harmonized with the letter and spirit of the treaty so far as can reasonably be done. *United States v. White,* 508 F.2d 453 (8th Cir. 1974).

At times, courts have required a "definite expression of intention" (to abrogate), *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 118, 58 S.Ct. 794, 798, 82 L.Ed. 1213 (1938), or have said that the intention to abrogate must be "clearly and unequivocally stated." *Bennett County v. United States,* 394 F.2d 8, 11–12 (8th Cir. 1968). It has also been said that the statute in question should be liberally construed in favor of the Indian treaty rights. *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

There may well be "a growing judicial tendency to require clarity and specificity in legislative abrogation." Wilkenson & Volkman, supra, at 630. In *United States v. White,* supra, the Court stated that to affect Indian treaty rights, "it was incumbent upon Congress to expressly abrogate or modify the spirit of the relationship between the United States and Red Lake Chippewa Indians."

Thus, the tests employed by the courts range from liberally construing the statute in favor of Indian treaty rights to requiring Congress to expressly abrogate the treaty rights. All of the tests require the Court to make a careful study of the statutory language.

It must first be noted that nowhere in either the 1860 Act or the 1862 Resolution is Article 11 of the 1825 Treaty mentioned. There is no language in either piece of legislation flatly abrogating Article 11 of the Treaty. However, the Court has previously suggested the real reason for no attempt to repeal Article 11 in his discussion of its generic purpose to preserve United States sovereignty over the reserved lands (pp. 615–616). Nothing in the 1860 Act talks of abrogating any portion of the Treaty. The Act mentions the provisions of Article 6 of the Treaty and then states that "all of the title, interest and estate of the United States is hereby vested in the said reservees." While this language would, standing alone, appear to be fee simple title with no restriction on alienation, such a meaning would be inconsistent both with the terms of the Treaty and with the rest of the Act which sets forth restrictions on alienation of the tracts. Nothing in the 1862 Resolution addresses abrogation of the 1825 Treaty. In fact, the Treaty is not even mentioned.

■ Thus, if the Court were to be bound solely by the language in *United States v. White,* requiring *express* abrogation, the Court would have to hold that the legislation did not modify the Article 11 restrictions of the Treaty. The Court is convinced, however, that an express abrogation is not always required. The Supreme Court's statement in *Menominee Tribe* that the intent to abrogate is not to be lightly imputed to Congress would, to the Court, mean that the intent to abrogate can, under some circumstances, be imputed to Congress in the absence of express language of abrogation. If the intent of Congress is sufficiently clear, then abrogation, or partial abrogation, can be imputed.

In order to determine whether to impute to Congress the intent to abrogate the 1825 Treaty restrictions on alienation, the Court will first examine the statutory language. Defendants contend that the 1860 and 1862 Acts, when read together, clearly vest fee simple title in the half-breeds. This Court agrees that such is the effective result of the two enactments. They must, however, be read singly and in time sequence as to enactment in light of the historical circumstances of the times. The Court should liberally construe the statutory language in favor of the Indian treaty rights. *Choate v. Trapp,* supra. Such liberal construction yields a plausible interpretation. The 1860

Act upheld the general restriction on alienation embodied in the 1825 Treaty, but provided that the lands could be passed through inheritance and set forth a particular system for alienating the land and protecting the Indian beneficiaries. Under this system, the Secretary was given the power to either give the proceeds directly to the parties or apply them for their benefit in the way he saw as most advantageous to them.

▆▆▆ Thus, the 1860 Act carried out or was in accord with the treaty provisions of Article 11, which provided there could be no disposition of the treaty land reserved without the permission of the United States, and the further provision that henceforth from the treaty date the Kansas Indians "shall ever remain under the protection of the United States" by providing, first, the requisite permission of the United States, and second, for a method of land transfer to best protect the interests of the half-breeds or their heirs. Indeed, what clearer way could exist to give the permission of the United States than by an official act of Congress signed by the President. This 1860 Act is clear and unambiguous in its language, carried out the 1825 Treaty provisions, and effectively terminated and superseded it as a governing instrument over the half-breed lands. The 1862 Resolution in clear language repealed the authority of the Secretary of the Interior to sell the land for the Indians, but left intact that portion of the 1860 Act which carried out the consent provision of the Treaty while expressing the intent that the lands could pass by traditional laws of alienation and inheritance.

Thus, while retaining the provision of the 1860 Act, giving the sovereign permission of the United States to disposition of the half-breed lands, it also reflected an official change of attitude by the United States as a sovereignty that the best protection of the interest of the 23 individual half-breeds or their heirs was to give them the right of free will alienation possessed by American citizens.

There was allusion in the plaintiffs' argument, with considerable historical foundation, to the effect that the Civil War began between 1860 and 1862, which caused a change in moral attitude towards the Indians as the vicissitudes of war may have dictated, and more particularly, as the best interests of the Union were seen in pleasing the profiteers in the potential free state of Kansas. Nevertheless, the 1862 Resolution was and remained a deliberate expression of national sovereignty by the Congress. Defendants' Ex. 31, 32, 33, by Department of Interior.

This interpretation is in harmony with the terms of the Treaty through the enactment of the 1860 Act, and effectively and plainly abrogated Article 11 of the 1825 Treaty as it applied to the Kansas half-breeds.

If the Court were to rely solely on the statutory language, which does carry a clear expression of congressional intent, some case law dealing with treaty abrogation would appear to compel the Court to look further to other indicia of congressional intent. The legislative history, as previously discussed, is so scanty as to be of little help in determining what intent should be imputed to Congress.

The Court is aware of prior judicial interpretation of these acts. In *Swope v. Purdy*, 23 F.Cas. 576 (C.C.D.Kan.1870) (No. 13,704), the federal court held that the joint Resolution of 1862 removed the restrictions on alienation imposed by the Act of 1860, and that a deed made in 1864 conveyed legal title. In *Smith v. Stevens*, 77 U.S. (10 Wall.) 321, 19 L.Ed. 933 (1870), the Court, in dicta, assumed that the joint Resolution of 1862 removed all restrictions on alienation. These decisions, while substantially on point with this case, predate the evolution of legal protection of Indian treaty rights embodied in more recent case law. In light of the subsequent great changes in the principles of stare decisis law regarding the Indians, the Court views these two cases as less authoritative than being res judicata on the issue here, but must view them as contemporaneous judicial holdings of congressional intent.

Much more important, however, is the administrative interpretation of the 1860 and 1862 legislation. It is clear that this Court, as a matter of law, must consider the history of administrative interpretation of the 1860 and 1862 legislation. Interpretation of a statute by those charged with administering and enforcing it, and their practices which reflect their understanding of the statute, have been given deference by the courts when faced with a problem of statutory construction. *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). Even greater weight must be given to "contemporaneous" interpretations, those made soon after enactment of the statute. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). The uniform and contemporaneous interpretations of those charged with administering Indian affairs are entitled to special weight, as these persons are presumed to be familiar with the backgrounds and purpose of Indian legislation. *Assinbone & Sioux Tribe v. Nordwick*, 378 F.2d 426 (9th Cir. 1967). Archival documents revealing the contemporaneous views of those charged with administering Indian legislation have been given great weight. *Russ v. Wilkins*, 624 F.2d 914 (9th Cir. 1980).

In this case, there are numerous uniform and contemporaneous interpretations of the meaning of the 1860 and 1862 legislation which support both this Court's and defendants' interpretation of the statutes.

On July 28, 1862, Acting Commissioner of Indian Affairs, Mix, wrote to United States Senator O. H. Browning. In his letter he commented on the effect of the 1862 Resolution:

> "The effect of this resolution as construed by this Office is that the title of the parties interested is vested in them absolutely by virtue of the Act of May 26th, 1860, and consequently their conveyances are not subject in any manner to the control of this Department. In other words the owners of these lands are by said Resolution empowered to sell and convey said lands as fully and freely as purchasers of public lands may do when holding by patent from the United States."

Defendants' Ex. 15.

A copy of the above letter was sent on July 30, 1862, to the Bellmards, a family of reservees and heirs who had made inquiries as to their ability to convey.

On August 26, 1862, Acting Commissioner Mix, said in a letter to Oren Curtis, the father of Vice-President Charles Curtis, of Kansas, a representative of some reservees:

> "The Act of Congress of July 17th, 1862, to which allusion is made in the communication last mentioned has deprived this Department of all jurisdiction as to the subject of the various inquiries submitted.... All questions as to the rights of grantees, heirships, titles liability to taxation, in short the whole subject matter, belong exclusively to the courts of Kansas by virtue of said act of Congress and to those courts you must therefore necessarily apply for their adjudication."

Defendants' Ex. 18.

In a letter dated February 19, 1863, Secretary of the Interior, Usher, wrote to United States Senator S. Pomeroy:

> "[The reservee] is not under any disability requiring this Department to ratify his act of conveyance.... There is no law making it necessary to its validity, or proper that it shall be approved by the Secretary of the Interior."

Defendants' Ex. 21.

Commissioner of Indian Affairs, William Dole, said in a letter dated February 27, 1863:

> "The effect of this legislation as construed by this office is to vest the absolute title to said lands in the original grantees their heirs or assigns and to transfer to the courts of Kansas exclusive jurisdiction as to all questions relating to said titles. Consequently the copies of evidence you request will be of no value in the adjudication of the questions in which you are interested."

Defendants' Ex. 22.

On May 20, 1863, Commissioner of Indian Affairs, Dole, stated in a letter to D. M. Jones:

"As this Resolution is construed by this Department the entire jurisdiction of all questions of identity of person or right to said lands is thereby vested in the local courts of Kansas.... The effect of the resolution already mentioned was to vest an absolute title in the original grantees their heirs or assigns...."

Defendants' Ex. 23.

Recent administrative interpretations have been consistent with those made near the time of the legislation. In a letter to Congressman Emmanuel Celler, December 17, 1965, Secretary of the Interior, Stewart Udall, stated:

"The effect of the 1862 Act was to remove completely the Federal interest in the lands and to terminate any trust responsibility that may have existed under the earlier legislation."

Defendants' Ex. 28.

In a letter of October 31, 1966, to Congressman Page Belcher, Secretary Udall stated:

"By the 1860 and 1862 Acts Congress gave the allottees full and unrestricted title to their lands.... From that time on, the allottees had full authority to sell their lands."

Defendants' Ex. 29.

In light of the uniform, contemporaneous and longstanding administrative interpretation of the 1860 and 1862 legislation, the Court experiences no hesitation in imputing to Congress the intent to abrogate the restriction on alienation embodied in the Treaty of 1825 as it applied to Kansas half-breed lands allotted therein. The statutory language is certainly more than capable of being construed as giving the reservees title in fee simple with no restrictions on alienation. As noted previously, while this is the most reasonable construction, it is not the only possible construction, as borne out by plaintiffs' contentions. The evidence of contemporaneous administrative interpretation, however, adds such strong weight to the construction favoring abrogation that

the Court believes it is not "lightly" imputing to Congress the intent to abrogate, but rather the Court finds a clear intent to abrogate. While the case law requires the Court to take a sympathetic view of the position of the Indians, the law does not permit the Court to disregard the intent of Congress. E.g., *Rosebud Sioux v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

The effect of the abrogation in 1860 of the treaty restriction on alienation and the 1862 Resolution, was to free the owners of the tracts to convey the land without federal approval. No transfer subsequent to the July 17, 1862 Resolution can be invalid for lack of federal approval. As to any pre-1862 conveyances which may have violated the restriction on alienation contained in the 1825 Treaty and reaffirmed in the superseding 1860 Act, the statute of limitations began to run against the grantees and their heirs as of the date of the 1862 Resolution removing the restriction. *Schrimpscher v. Stockton*, 183 U.S. 290, 22 S.Ct. 107, 46 L.Ed. 203 (1902); *Cohen*, supra, at 163. Such claims are clearly time-barred, as are the other nineteenth century claims advanced by plaintiffs based on fraud and duress. All possibly applicable statutes of limitation have run. These include K.S.A. § 60–503 (15 year limit for adverse possession); K.S.A. § 60–504 (5 year limit for execution sales); K.S.A. § 60–505 (5 year limit for sales by guardians, administrators and executors); K.S.A. § 60–506 (2 year limit on forcible detention of real property); K.S.A. § 60–507 (15 year limit for unspecified real property transactions). K.S.A. § 58–2249, first enacted in 1874, also sets up a three year limit applicable to former Indian lands.

## THE 1968 PRIVATE ACT

While the Court has held that plaintiffs' claim to quiet title against the class of defendant landowners is definitely barred on the basis of the effect of the 1860 and

1862 Acts of Congress, the Court is equally convinced that another sound legal basis also bars the plaintiffs' claim.

In 1968, after several previous years' activity in Congress motivated by the zeal of these same two individual plaintiffs on behalf of their Kaw brethren, the 90th Congress enacted Private Law 90–318, 82 Stat. 1420, on August 8, 1968, for the financial relief of the 23 named half-breed individuals mentioned in Article 6 of the 1825 Treaty previously discussed, or their heirs. In this Act, Congress directed the sum of $73,600 to be paid to heirs of the 23 named allottees in amounts of $3,200 to each set of heirs.

The most significant language in Private Law 90–318 reads as follows:

"The amounts paid under the authority of this Act shall be paid in full and final satisfaction of all claims of the named individuals or their heirs against the United States based upon the loss of Indian lands included in the twenty-three halfbreed Kaw allotments granted the above named individuals under article 6 of the treaty of June 3, 1825 (7 Stat. 244) in the Territory of Kansas, and in full satisfaction of any claims of the original allottees or his heirs for the consequent loss of use of the land."

Defendants rely on the above-quoted language of the Act and its legislative history as a complete bar in itself to plaintiffs' claim, as well as a ratification of previous governmental conduct as to the handling of the treaty lands of the 23 allottees. Plaintiffs would explain away the language of the Act and its history as a moral and sentimental gesture of conscience by the Congress for past oversights and omission of duty by the United States to these Indian wards, and state that the appropriated compensation was for "loss of use" by the Indians for pre-Civil War exploitive and predatory actions of white Americans, and not as compensation for the loss of title and ownership.

Again, following time honored legal precepts of statutory interpretation, the Court will first look to the language of the legisla-tion to determine whether its words and meaning are clear. Next, the Court will examine the legislative intent as expressed by the congressional authors of, the congressional supporters or opponents of, and the witnesses for, such legislation.

A reading of the above-quoted principal paragraph of Private Law 90–318 indicates a twofold purpose, viz.:

"The amounts paid under authority of the Act shall be paid

(1) in full satisfaction of all claims of the named individuals or their heirs against the United States based upon the loss of Indian lands included in the twenty-three half breed Kaw allotments granted under article 6 of the treaty of June 3, 1925 . . . and,

(2) in full satisfaction of any claims of the original allottees or his heirs for the consequent use of the land." (Underlining and numerical emphasis supplied.)

It appears to the Court that the clear meaning of the first purpose was under use of the word "all" and the phrase "loss of Indian lands," to express loss of title and ownership. It appears abundantly clear also that the meaning and intent of the second stated purpose was to forever bar "any" claims for "the consequent loss of use" of the land. It has always been a hornbook tenet of property law that there exists two types of compensatory damages, viz., the fair market value of the land for loss of title and ownership (loss of Indian lands), and damages for loss of use because of or (consequent) to a titled owner being deprived of the temporary use and profits of such land by a wrongful taking.

Both the language, standing alone, and the dual stated purposes, indicate that the clear intention of the lawmakers was to "cover the waterfront" or blanket out any lingering possible future legal claims. It is true that the language of the Act reads "claims . . . against the United States." Seemingly and arguably, as the plaintiffs urge, the statutory wording did not release

any claims against present landowners. However, there appear to be very valid and cogent legal reasons precluding such a judicial conclusion.

The legislative history of Private Law 90–318 serves to confirm that it was indeed the intent of Congress to discharge any possible claims against the present private landowners, as well as the United States. The legislation was first introduced in the House as H.R. 10590, and in the Senate as S.2203, in the First Session of the 89th Congress by Congressman Page Belcher and Senator Fred Harris, both from Oklahoma, and presumably in close touch with individually named plaintiffs and prominent tribal leaders in carrying out their desires and intentions. Failing to pass the 89th Congress, the Act was reintroduced in the 90th Congress by the same authors, as H.R. 8391 in the House. Hearings were held and extensive congressional reports were made, shown as Defendants' Ex. 31, 32 and 33.

These reports, all containing nearly the same language, adopted by the various committees and by the Congress on final passage, disclose in an expression of views by the Bureau of the Budget for the Executive Office of the President, the following verbiage:

"Finally, the bill provides that when the payments are accepted, they shall be in full settlement of any and all claims of the allottees or their heirs of any nature whatsoever concerning the allotments involved. We assume that this last provision is intended not only to settle any claims against the United States for failure to fulfill any trust responsibilities it may have had toward the 23 allottees but also to settle any title claims which the heirs of the allottees now might have to the lands comprising the original allotments. These lands are now and have been for many years, privately owned and used and have been bought and sold by various owners."

Most strongly convincing, however, is the expression by Congressman Page Belcher, the primary sponsor of the Private Law, who made it crystal clear in the 1967 hearing held on the matter that the legislation was intended to extinguish all further claims to the 23 reserves by alleged heirs of the reservees. By written statement, Belcher told his fellow congressmen that the proposed act would benefit the present owners by removing any uncertainty regarding their titles due to the previous Indian ownership. He declared:

"Not only does this situation demand equity for the Indians. The land is today in a state of confusion; and, titles for the present occupants, who have no personal responsibility in this matter whatsoever, are not clear. *This legislation would serve to quiet the titles to the disputed lands for the benefit of the present occupants.*" (Emphasis supplied.)

Purportedly also, the hearing records before the Congressional Committees contained a similar statement of one of the individual plaintiffs which the Court need not consider to determine congressional intent as such. The Court does note that it is improbable that Congressman Belcher was making such a statement of intent contrary to the desires of his constituency.

One other matter must be noted as disclosed in the various committee reports. That is the basis or standard upon which ultimate recipients of the payments were awarded damages or compensation in the 1968 Act. Each contains the identical following paragraph or its substance:

"In recommending this legislation, the committee has fixed the land value of the allotment on the basis of a valuation of $5.00 an acre. The valuation of this land is based upon the fact that an appraisal was made of the property in 1862, and that each allotment was given a valuation on the basis of its value per acre. Averaging the values made at that time approximates $5.00 an acre, so that is the value adopted by the committee in fixing the amounts set forth in the amended bill."

In another part of the reports appears the following statement:

"According to the report of the Department of Interior, some of the allottees or their heirs were in possession of their property for many years after 1862. In another instance, there is evidence that the alleged loss of land was in fact a sale by the allottee for a total consideration of $3,450. In still other instances, as Interior points out, there were successful actions in ejectment maintained by the allottees or heirs."

Defendants' Ex. 31 and 33.

While these plaintiffs and the interested heirs of the allottees as a class may privately complain—as all unsuccessful litigants usually do—about inadequacies of valuation, as to fee title ownership of the lands and the stolen resources thereof, and the fact that they were unsuccessful in their Court of Claims action for interest on the awards of Private Act 90–318, this Court, who has had considerable exposure to eminent domain litigation, views these facts originating in archival records, shown in the Congressional Committee reports, and undoubtedly relied on by Congress, as buttressing a congressional intent to preclude possible claimants by paying the 1862 fair value for the fee simple ownership value at that time for all allottees and their heirs, even though not all were shown to have been bilked, cheated or imposed upon by some avaricious white Americans.

Thus, both the language and the legislative history of Private Law 90–318 demonstrate that the law was designed to extinguish all claims of the 23 individual reserves against *anyone* arising out of the events related to the 1825 Treaty.

For the above reasons, defendants' motion for summary judgment must be granted. The Court believes that this decision is mandated not only by law on two sound legal grounds, but also by public policy. The words of the Supreme Court in *Logan v. Davis*, 233 U.S. 613, 627, 34 S.Ct. 685, 690, 58 L.Ed. 1121 (1914), are as meaningful today as the day they were written:

"Many thousands of acres have been patented to individuals under that interpretation, and to disturb it now would be productive of serious and harmful results. The situation, therefore, calls for the application of the settled rule that the practical interpretation of an ambiguous or uncertain statute by the executive department charged with its administration is entitled to the highest respect, and, if acted upon for a number of years, will not be disturbed except for very cogent reasons."

Nothing in this opinion should be read to indicate that the Court is unsympathetic toward the plaintiffs and their position. The Court believes that a great injustice was probably done to some of the Kansas half-breeds in allowing forcible entries and inequitable or fraudulent conveyances to stand, an injustice all too typical of the general treatment of those American natives upon whom the white man chose to impose a conqueror's terms. Justice would not be served, however, by wresting those lands away, more than a century later, from equally innocent landowners. To exact retribution on the current landowners for the sins of their great-grandfathers would merely add to injustice, not right it.

To conclude, this Court is most strongly convinced that our legal jurisprudence correctly closes the door to any further relief or remedy for these particular Kaw Indian claimants, regardless of their subjective feelings that an injustice still persists. The appellate processes to review the legal correctness of this opinion is the last legal recourse available to these plaintiffs, and this Court trusts such a step to legal finality will be invoked.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment is hereby sustained.

IT IS FURTHER ORDERED that the costs in this case are to be assessed against the plaintiffs. If counsel for defendants believe that this judgment may affect any present real estate titles originating from these so-called Kansas half-breed lands,

they may submit an appropriate journal entry in the nature of the traditional quiet title journal entry of state courts, incorporating this opinion by reference.

## FOREWORD TO APPENDICES

Both because of the historical aspect of this interesting case and the necessity for interpretation and discussion of the Treaty as a complete legal instrument, the whole text, including the fascinating names and descriptive titles of the Indian signatories, is set forth in Appendix A hereto.

Additionally, since frequent reference is made in this opinion to our national unfairness to Indians generally and to the Kansas half-breeds in particular, the Court felt it proper to attach as Appendix B, the Department of Interior report of John Montgomery, Indian Agent, dated October 1, 1856, received in evidence as Plaintiffs' Exhibit 8, which graphically reflects a shameful period of Kansas territorial history.

## APPENDIX A

## ARTICLES OF A TREATY

*June 3, 1825.*

*Proclamation, Dec. 30, 1825.*

*Made and concluded at the City of Saint Louis, in the State of Missouri, between William Clark, Superintendant of Indian affairs, Commissioner on the part of the United States of America, and the undersigned Chiefs, Head Men, and Warriors of the Kansas Nation of Indians, duly authorized and empowered by said Nation.*

### ARTICLE 1.

*Cession by the Kansas.*

THE Kansas do hereby cede to the United States all the lands lying within the State of Missouri, to which the said nation have title or claim; and do further cede and relinquish, to the said United States, all other lands which they now occupy, or to which they have title or claim, lying West of the said State of Missouri, and within the following boundaries: beginning at the entrance of the Kansas river into the Missouri river; from thence North to the North-West corner of the State of Missouri; from thence Westwardly to the Nodewa river, thirty miles from its entrance into the Missouri; from thence to the entrance of the big Nemahaw river into the Missouri, and with that river to its source; from thence to the source of the Kansas river, leaving the old village of the Pania Republic to the West; from thence, on the ridge dividing the waters of the Kansas river from those of the Arkansas, to the Western boundary of the State line of Missouri, and with that line, thirty miles, to the place of beginning.

### ARTICLE 2.

*Reservation for the use of the Kansas.*

From the cession aforesaid, the following reservation for the use of the Kansas nation of Indians shall be made, of a tract of land, to begin twenty leagues up the Kansas river, and to include their village on that river; extending West thirty miles in width, through the lands ceded in the first Article, to be surveyed and marked under the direction of the President, and to such extent as he may deem necessary, and at the expense of the United States. The agents for the Kansas, and the persons attached to the agency, and such teachers and instructors as the President shall authorize to reside near the Kansas, shall occupy, during his pleasure, such lands as may be necessary for them within this reservation.

### ARTICLE 3.

*Payment to them for their cession.*

In consideration of the cession of land and relinquishments of claims, made in the first Articles, the United States agree to pay to the Kansas nation of Indians, three thousand five hundred dollars per annum, for twenty successive years, at their villages, or at the entrance of the Kansas river, either in money, merchandize, provisions, or domestic animals, at the option of the aforesaid Nation; and when the said annuities, or any part thereof, is paid in merchandize, it shall be delivered to them at the first cost of the goods in Saint Louis, free of transportation.

## ARTICLE 4.

The United States, immediately upon the ratification of this convention, or as soon thereafter as may be, shall cause to be furnished to the Kansas Nation, three hundred head of cattle, three hundred hogs, five hundred domestic fowls, three yoke of oxen, and two carts, with such implements of agriculture as the Superintendant of Indian Affairs may think necessary; and shall employ such persons to aid and instruct them in their agriculture, as the President of the United States may deem expedient; and shall provide and support a blacksmith for them.

*Cattle, hogs, &c. to be furnished by U. S.*

## ARTICLE 5.

Out of the lands herein ceded by the Kanzas Nation to the United States, the Commissioner aforesaid, in behalf of the said United States, doth further covenant and agree, that thirty-six sections of good lands, on the Big Blue river, shall be laid out under the direction of the President of the United States, and sold for the purpose of raising a fund, to be applied, under the direction of the President, to the support of schools for the education of the Kanzas children, within their Nation.

*Land to be sold for support of schools.*

## ARTICLE 6.

From the lands above ceded to the United States, there shall be made the following reservations, of one mile square, for each of the half breeds of the Kanzas nation, viz: For Adel and Clement, the two children of Clement; for Josette, Julie, Pelagie, and Victoire, the four children of Louis Gonvil; for Marie and Lafleche, the two children of Baptiste of Gonvil; for Laventure, the son of Francis Laventure; for Elizabeth and Pierre Carbonau, the children of Pierre Brisa; for Louis Joncas; for Basil Joncas; for James Joncas; for Elizabeth Datcherute, daughter of Baptiste Datcherute; for Joseph Butler; for William Rodgers; for Joseph Coté; for the four children of Cicili Compáre, each one mile square; and one for Joseph James, to be located on the North side of the Kanzas river, in the order above named, commencing at the line of the Kanzas reservation, and extending down the Kanzas river for quantity.

*Reservations for the use of half-breeds.*

## ARTICLE 7.

With the view of quieting all animosities which may at present exist between a part of the white citizens of Missouri and the Kanzas nation, in consequence of the lawless depredations of the latter, the United States do further agree to pay to their own citizens, the full value of such property as they can legally prove to have been stolen or destroyed since the year 1815: *Provided,* The sum so to be paid by the United States shall not exceed the sum of three thousand dollars.

*Agreement entered into by the U. S. for certain purposes.*

*Proviso.*

## ARTICLE 8.

And whereas the Kanzas are indebted to Francis G. Choteau, for credits given them in trade, which they are unable to pay, and which they have particularly requested to have included and settled in the present Treaty; it is, therefore, agreed on, by and between the parties to these presents, that the sum of five hundred dollars, towards the liquidation of said debt, shall be paid by the United States to the said Francois G. Choteau.

*Payment to F. G. Choteau.*

## ARTICLE 9.

There shall be selected at this place such merchandize as may be desired, amounting to two thousand dollars, to be delivered at the Kanzas river, with as little delay as possible; and there shall be paid to the deputation now here, two thousand dollars in merchandize and horses, the receipt of which is hereby acknowledged; which, together with the amount agreed on in the 3d and 4th articles, and the provisions made in the other articles of this Treaty, shall be considered as a full compensation for the cession herein made.

*Merchandise to amount of $2000 to be delivered at the Kanzas river.*

## ARTICLE 10.

**Punishment of offences.**

Lest the friendship which is now established between the United States and the said Indian Nation should be interrupted by the misconduct of Individuals, it is hereby agreed, that for injuries done by individuals, no private revenge or retaliation shall take place, but instead thereof, complaints shall be made by the party injured, to the other by the said nation, to the Superintendent, or other person appointed by the President to the Chiefs of said nation. And it shall be the duty of the said Chiefs, upon complaints being made as aforesaid, to deliver up the person or persons against whom the complaint is made, to the end that he or they may be punished, agreeably to the laws of the State or Territory where the offence may have been committed; and in like manner, if any robbery, violence, or murder, shall be committed on any Indian or Indians belonging to said nation, the person or persons so offending shall be tried, and, if found guilty, shall be punished in like manner

**Chiefs to exert themselves to recover stolen property, &c.**

as if the injury had been done to a white man. And it is agreed, that the Chiefs of the Kanzas shall, to the utmost of their power, exert themselves to recover horses or other property which may be stolen from any citizen or citizens of the United States, by any individual or individuals of the Nation; and the property so recovered shall be forthwith delivered to the Superintendent, or other person authorized to receive it, that it may be restored to its proper owner; and in cases where the exertions of the Chiefs shall be ineffectual in recovering the property stolen as aforesaid, if sufficient proof can be adduced that such property was actually stolen, by any Indian or Indians belonging to the said nation, the Superintendent or other officer may deduct from the annuity of the said nation a sum equal to the value of the property which has been stolen. And the United States hereby guarantee, to any Indian or Indians, a full indemnification for any horses or other property which may

**Proviso.**

be stolen from them by any of their citizens: *Provided,* That the property so stolen cannot be recovered, and that sufficient proof is produced that it was actually stolen by a citizen of the United States. And the said Nation of Kanzas engage, on the requisition or demand of the President of the United States, or of the Superintendent, to deliver up any white man resident amongst them.

## ARTICLE 11.

It is further agreed on, by and between the parties to these presents, that the United States shall forever enjoy the right to navigate freely all water courses or navigable streams within the limits of the tract of country herein reserved to the Kanzas Nation; and that the said Kanzas Nation shall never sell, relinquish, or in any manner dispose of the lands herein reserved, to any other nation, person or persons whatever, without the permission of the United States for that purpose first had and obtained. And shall ever remain under the protection of the United States, and in friendship with them.

**U. S. to enjoy the right of navigating the water courses, &c.**

## ARTICLE 12.

This Treaty shall take effect, and be obligatory on the contracting parties, as soon as the same shall be ratified by the President, by and with the consent and advice of the Senate of the United States.

**Treaty binding when ratified.**

In testimony whereof, the said William Clark, Commissioner as aforesaid, and the Deputation, Chiefs, Head-men and Warriors of the Kanzas Nation of Indians, as aforesaid, have hereunto set their hands and seals, this third day of June, in the year of our Lord eighteen hundred and twenty-five, and of the Independence of the United States of America the forty-ninth year.

### WILLIAM CLARK.

Nom-pa-wa-rah, or the white plume. 
Ky-he-ga-wa-ti-nin-ka, or the full chief. 
Ky-he-ga-wa-che-he, or the chief of great valour. 
Ky-he-ga-shin-ga, or the little chief. 
Ke-bah-ra-hu. 
Me-chu-chin-ga, or the little white bear. 

Hu-ru-ah-te, or the Real Eagle. 
Ca-she-se-gra, or the track that sees far. 
Wa-can-da-ga-tun-ga, or the great doctor. 
O-pa-she-ga, or the cooper. 
Cha-ho-nush. 
Ma-he-ton-ga, or the American.

`WITNESSES PRESENT:` — R. Wash, Secretary. W. B. Alexander, Sub-Indian Agent. John F. A. Sandford. G. C. Sibley, United States' Commissioner. Baronet Vasquez, United States' S. Agent. Russel Farnham. Jno. K. Walker. Jno. Simonds, jr. Sanderson Robert. L. T. Honore, U. S. Intptr. William Milburn. Baptis Ducherut, Interpreter for Kansas. Paul Louise, Osage Interpreter. Noel Dashnay, Interpreter. Ant. Le Claire, Interpreter.

To the Indian names are subjoined marks.

## APPENDIX B

### No. 42.

KANSAS AGENCY,
*Kansas Territory, October 1, 1856.*

SIR: It seems that the affairs and present condition of this agency should attract more than the usual attention of those whose duty and whose business it is to exercise a supervision for the present interest and future welfare of those people, whose rights, established by treaty and by law, have been encroached, but who have remained remarkably quiet and unobstrusive, refraining from any infringement or violation of their sacred treaties with the government, relying upon those in whom they never fail to repose the greatest confidence for that protection of their rights, their land and property, which is justly due them.

While the Kansas have been almost entirely surrounded by those white people who have for the last twelve months incessantly engaged in a sanguinary warfare among themselves, they have witnessed, with amazement and disgust, the horrid scene of political contention in the Territory; astonished and affrighted by the proceedings of their friends, the whites, for a period they abandoned their homes for the safety of themselves and property. Although everything has occurred on the part of the people of Kansas Territory that would tend to excite the passionate feelings of the totally uncivilized red man, and to prompt him to actions not peculiar to him while in a state of uncivilization and almost barbarism, and although the Kansas have seen their country taken from them, and their property maliciously destroyed by unprincipled and lawless white men, they have remained quiet and peaceable, for which they deserve credit; only wishing to live in the enjoyment of their rights and in obedience to the laws of the land, and not seeking private revenge, as might reasonably be expected of the Kansas from their past history.

The tract of country on the north side of the Kansas river, known as the half-breed Kansas reservation, has for the last two years been the object of filthy speculation. It will be remembered that several of the government functionaries for the Territory of Kansas engaged in purchasing a portion of this land of the grantees yet living on the upper part of the reservation, in which undertaking the purchasers failed; from that time to this, the lower portion of the reservation, on which there are no Indians residing, has been, and is at this time, subject to the intrusion of lawless men; stripping the land of its timber, opening farms, cultivating the soil, and appropriating the fruits to their own use.

The general instructions, issued October 8, 1855, for the removal of intruders on Indian lands, were on the 23d and 24th of June last being complied with on my part in regard to the half-breed Kansas lands, when the whole weight and influence of those whose duty it was to co-operate with me in the removal of those people who were found in the Indian country in open transgression of the law were thrown in favor of the intruders; and they receiving the advice and counsel of official men, and of men of more intelligence and prudence than themselves, declared the land was not Indian land, that it was public land, and that they would occupy it at all hazards. Thus they having presumptuously set up a title to the land, and simply because I had somewhat transcended my instructions by destroying some cabins in order to facilitate the removal of the intruders, Captain Walker, of the United States army, who had

been ordered to aid me in the removal, at the very time that he should have been vigoron and prompt in his duty, refused to give me any further assistance.

Thus the matter ended, after every exertion on my part to carry out the views and instructions of the Department of Indian Affairs. The larger portion of the half-breed Kansas reserve now quietly rests in the possession of the intruders, after actually driving by force and violence from one or two of the tracts the identical Indians for whom the land was reserved. Those who have unhesitatingly, and in defiance of all law and authority, settled upon and occupied this land, may for some time live in the enjoyment of their illegal proceedings; but I do sincerely hope there will be some action taken on the part of Congress during its next session that will result in the benefit of those poor, inoffensive, unsuspecting Indians, who have been wronged and outraged by lawless and crafty white men. The half-breed Kansas, or the greater number of them, are industrious and intelligent, well-versed in the English, French and Kaw languages, profess the Catholic religion, and have almost a thorough knowledge of the arts of husbandry, in which some of the Indians are considerably engaged. Owing to the remoteness of this part of my agency from the main tribe with whom I am stationed, and owing to the great inconvenience of travelling, I have not been able to visit the half-breeds as often as necessary. I do not know what may have been the policy adopted by the government in the civilization of the Kansas at the time they were separated from the half-breeds, but I am forced to believe that the separation of the main tribe and the half-breeds has only retarded the progress of the civilization and christianizing of the former; from the fact, that there has been no change in the Indian customs and manners to those of the white man; and from the fact that there has been no white people or half-breeds among the full-blooded Indians since they were removed from the Kansas river to this place. The native Indians having no white people affiliated with their tribe have strictly adhered to their natural customs and pursuits of life. The Canadian French, in my opinion, have done more to civilize the Kansas than all the schools and moral institutions that have ever been established for their benefit. In consequence of the boundaries of the Kansas reservation not having been surveyed and marked at the time the Territory of Kansas was thrown open to settlement, many persons ignorant of the designated bounds of the Kansas reserve, and guided only by a map of the geographical position of the Indian reservations respectively, unhesitatingly settled upon a stream called Rock creek, which stream, since the bounds of the reserve have recently been surveyed, is found to be entirely within the country of the Kansas Indians. Those settlers, and also those on the Neosho, above this place, who thought at the time they settled there, that they were on government lands, and also those settlers on the Neosho, below the junction of Rock creek with the Neosho river, and within the bounds of the Kansas reserve, have been of great annoyance and trouble to this agency. Measures are soon to be taken for their removal; but judging from former experience in removing people from Indian lands, I fear that I will not be able to succeed. Where a certain class of people assume to themselves the right to judge of matters pertaining to the Indian country, it is very difficult for an Indian agent to perform with promptness the duties of his office. I much regret to say that the worst evil that ever befel the Indian race has been for the last year or two greatly indulged in by the Kansas Indians. Whiskey is obtained by quantities in the Territory, and when not immediately made use of, is secretly brought into the Indian country where it is freely and excessively used; while the Indians are enabled to procure a full supply of this filthy, adulterated stuff, it seems that I cannot, by ordinary means, suppress this detestable practice which will inevitably result in a great injury to the Indians. There are some of the Kansas who are becoming tired of the roving life, and wish to adopt the modes and customs of the white people; and if they only had twice the annuity that is paid to them, with a liberal agricultural fund, it is now my belief that several of the Indians could easily be induced to throw off

the blanket and breech-cloth, and adopt the apparel of the white man, dwell in houses instead of the skin or bark lodge, and to cultivate the soil. I have done all in my power to stimulate their desire to acquire a knowledge of the principle arts of civilized life. That these Indians can be *civilized*, there is no doubt; but they must first be free from all annoyance and embarrassment, confined to a smaller scope of country, and sufficient means furnished them to begin with; and also a school, conducted on a liberal scale, would be greatly to the advantage of this nation; as it is, their present condition is anything but good or promising. The Kansas have done unusually well throughout the past year—only one or two cases of the small-pox having occurred; and notwithstanding the extreme drought the last season, they have raised corn, beans and pumpkins sufficient for their subsistance during the coming winter. Although there has been from the last December, 1855, up to this time, no blacksmith for these Indians, it cannot be inferred that the absence of that mechanic would be of material injury to them, as the labor in this shop consisted chiefly in the repairing of fire-arms. I have recently employed another smith, who is by me instructed to abstain from any work on fire-arms, as it is my opinion the *gun* is in nowise advantageous to the cause of civilization.

Respectfully submitted by your obedient servant.

JOHN MONTGOMERY,
Indian Agent.

Col. A. CUMMING,
Superintendent Indian Affairs, St. Louis, Mo.