MENOMINEE TRIBE OF INDIANS *v.*
UNITED STATES.

No. 187. Argued January 22, 1968.—Reargued April 25, 1968.—
Decided May 27, 1968.

*Charles A. Hobbs* reargued the cause for petitioner. With him on the briefs on the reargument and on the original argument were *John W. Cragun, Angelo A. Iadarola,* and *James R. Modrall III.*

*Louis F. Claiborne* reargued the cause for the United States. With him on the brief on the reargument were *Solicitor General Griswold* and *Assistant Attorney General Martz,* and on the original argument *Mr. Griswold, Acting Assistant Attorney General Harrison,* and *Roger P. Marquis.*

*Bronson C. La Follette,* Attorney General of Wisconsin, argued the cause on the reargument for the State of Wisconsin, as *amicus curiae.* With him on the briefs was *William F. Eich,* Assistant Attorney General.

Briefs of *amici curiae* were filed by *Albert J. Ahern* for the National Congress of American Indians, and by *Arthur Lazarus, Jr.,* for the Association of American Indian Affairs, Inc.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Menominee Tribe of Indians was granted a reservation in Wisconsin by the Treaty of Wolf River in 1854. 10 Stat. 1064. By this treaty the Menominees retroceded certain lands they had acquired under an earlier treaty and the United States confirmed to them the Wolf River Reservation "for a home, to be held as Indian lands

are held." Nothing was said in the 1854 treaty about hunting and fishing rights. Yet we agree with the Court of Claims [1] that the language "to be held as Indian lands are held" includes the right to fish and to hunt. The record shows that the lands covered by the Wolf River Treaty of 1854 were selected precisely because they had an abundance of game. See *Menominee Tribe* v. *United States*, 95 Ct. Cl. 232, 240–241 (1941). The essence of the Treaty of Wolf River was that the Indians were authorized to maintain on the new lands ceded to them as a reservation their way of life which included hunting and fishing.[2]

---

[1] *Menominee Tribe* v. *United States*, 179 Ct. Cl. 496, 503–504, 388 F. 2d 998, 1002.

[2] As stated by the Supreme Court of Wisconsin:

"It would seem unlikely that the Menominees would have knowingly relinquished their special fishing and hunting rights which they enjoyed on their own lands, and have accepted in exchange other lands with respect to which such rights did not extend. They undoubtedly believed that these rights were guaranteed to them when these other lands were ceded to them 'to be held as Indian lands are held.' Construing this ambiguous provision of the 1854 treaty favorably to the Menominees, we determine that they enjoyed the same exclusive hunting rights free from the restrictions of the state's game laws over the ceded lands, which comprised the Menominee Indian Reservation, as they had enjoyed over the lands ceded to the United States by the 1848 treaty." *State* v. *Sanapaw*, 21 Wis. 2d 377, 383, 124 N. W. 2d 41, 44 (1963).

The Court said in *United States* v. *Winans*, 198 U. S. 371, 380–381, "[W]e will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right without regard to technical rules.' "

As the Solicitor General points out in his brief, the words "to be held as Indian lands are held" sum up in a single phrase the familiar provisions of earlier treaties which recognized hunting and fishing as normal incidents of Indian life. See Treaty of January 3, 1786,

What the precise nature and extent of those hunting and fishing rights were we need not at this time determine. For the issue tendered by the present decision of the Court of Claims, 179 Ct. Cl. 496, 388 F. 2d 998, is whether those rights, whatever their precise extent, have been extinguished.

That issue arose because, beginning in 1962, Wisconsin took the position that the Menominees were subject to her hunting and fishing regulations. Wisconsin prosecuted three Menominees for violating those regulations and the Wisconsin Supreme Court held[3] that the state regulations were valid, as the hunting and fishing rights of the Menominees had been abrogated by Congress in the Menominee Indian Termination Act of 1954. 68 Stat. 250, as amended, 25 U. S. C. §§ 891–902.

Thereupon the tribe brought suit in the Court of Claims against the United States to recover just compensation for the loss of those hunting and fishing rights.[4] The Court of Claims by a divided vote held that the tribe possessed hunting and fishing rights under the Wolf River Treaty; but it held, contrary to the Wisconsin Supreme Court, that those rights were not abrogated by the Termination Act of 1954. We granted the petition for a writ of certiorari in order to resolve that conflict between the two courts. 389 U. S. 811. On oral argument both petitioner and respondent urged that the judgment of the Court of Claims be affirmed. The State of Wisconsin appeared as *amicus curiae* and argued that that judgment be reversed.

---

with the Choctaws, 7 Stat. 22; Treaty of January 31, 1786, with the Shawnees, 7 Stat. 27; Treaty of January 9, 1789, with the Wyandots, 7 Stat. 29; Treaty of August 3, 1795, with the Wyandots, 7 Stat. 52; Treaty of November 10, 1808, with the Osages, 7 Stat. 109; Treaty of August 24, 1835, with the Comanches, 7 Stat. 475.

[3] *State* v. *Sanapaw*, 21 Wis. 2d 377, 124 N. W. 2d 41.

[4] See *Shoshone Tribe* v. *United States*, 299 U. S. 476.

In 1953 Congress by concurrent resolution [5] instructed the Secretary of the Interior to recommend legislation for the withdrawal of federal supervision over certain American Indian tribes, including the Menominees. Several bills were offered, one for the Menominee Tribe that expressly preserved hunting and fishing rights.[6] But the one that became the Termination Act of 1954, *viz.*, H. R. 2828, did not mention hunting and fishing rights. Moreover, counsel for the Menominees spoke against the bill, arguing that its silence would by implication abolish those hunting and fishing rights.[7] It is therefore argued that they were abolished by the Termination Act.

The purpose of the 1954 Act was by its terms "to provide for orderly termination of Federal supervision over the property and members" of the tribe. Under its provisions, the tribe was to formulate a plan for future control of tribal property and service functions theretofore conducted by the United States. On or before April 30, 1961, the Secretary was to transfer to a tribal corporation or to a trustee chosen by him all property real and personal held in trust for the tribe by the United States.[8]

The Menominees submitted a plan, looking toward the creation of a county in Wisconsin out of the former reservation and the creation by the Indians of a Wisconsin corporation to hold other property of the tribe and its members. The Secretary of the Interior approved the plan [9] with modifications; the Menominee

---

[5] H. R. Con. Res. 108, 83d Cong., 1st Sess., 67 Stat. b132.

[6] S. 2813 and H. R. 7135, 83d Cong., 2d Sess.

[7] Joint Hearings, Subcommittees of Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 6, on S. 2813, H. R. 2828, and H. R. 7135, pp. 697, 704.

[8] The Termination Act also provided for a closing of the membership roll of the tribe with distribution to the enrollees of certificates of beneficial interest in the tribal property. The roll was closed in December 1957. 22 Fed. Reg. 9951.

[9] 26 Fed. Reg. 3726.

Enterprises, Inc., was incorporated; [10] and numerous ancillary laws were passed by Wisconsin integrating the former reservation into its county system of government.

[10] Wisconsin questions whether Menominee Enterprises, Inc., to which all tribal assets were conveyed pursuant to the termination plan (26 Fed. Reg. 3726), should be viewed as the successor entity to the tribe and the present holder of the hunting and fishing rights, and, if so, to what extent the corporation or the tribal members thereof can withhold or parcel out these rights.

The Menominees, on the other hand, claim the rights are held by Menominee Indian Tribe of Wisconsin, Inc., a tribal body organized in 1962. Its Articles of Incorporation provide for four categories of membership (Article X): Menominee Indian membership (§ 1 (a)) (all Menominee Indians appearing on the final roll of the tribe approved by the Secretary of the Interior, n. 8, *supra*); Associate membership of Menominee descendants (§ 1 (b)) (any descendants of enrolled Menominee Indians or recipients through inheritance of Menominee Enterprises securities); Associate membership of persons married to enrolled Menominees (§ 1 (c)); and Associate membership of non-Indians (§ 1 (d)). In March 1968, the first category was enlarged by amendment of Art. X, § 1 (a), of the Articles of Incorporation to include all descendants of enrolled Menominee Indians with at least one-quarter Menominee blood, one or both of whose parents resided on the Menominee Reservation at the time of the descendant's birth. The corporation also adopted a resolution defining those persons entitled to exercise the hunting and fishing rights, which provided:

"All tribal members, as defined in Article X of the Articles of Incorporation, Section 1 (a), and only such members, shall have the right to exercise tribal hunting and fishing rights, subject to tribal regulations;

"PROVIDED, HOWEVER, that any member who violates any tribal hunting or fishing regulation may upon finding of the Council of Chiefs be declared ineligible to exercise such rights, for such period of time as the Council of Chiefs may specify."

We believe it inappropriate, however, to resolve the question of who the beneficiaries of the hunting and fishing rights may be; and we expressly reserve decision on it. Neither it nor the nature of those rights nor the extent, if any, to which Wisconsin may regulate them has been fully briefed and argued by the parties either in the Court of Claims or in this Court, and the posture of the present litigation does not require their resolution.

The Termination Act provided that after the transfer by the Secretary of title to the property of the tribe, all federal supervision was to end and "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction."

It is therefore argued with force that the Termination Act of 1954, which became fully effective in 1961, submitted the hunting and fishing rights of the Indians to state regulation and control. We reach, however, the opposite conclusion. The same Congress that passed the Termination Act also passed Public Law 280, 67 Stat. 588, as amended, 18 U. S. C. § 1162. The latter came out of the same committees of the Senate and the House as did the Termination Act; and it was amended [11] in a way that is critical here only two months after the Termination Act became law. As amended, Public Law 280 granted designated States, including Wisconsin, jurisdiction "over offenses committed by or against Indians in the areas of Indian country" named in the Act, which in the case of Wisconsin was described as "All Indian country within the State." But Public Law 280 went on to say that "Nothing in this section . . . shall deprive any

---

[11] As originally enacted Public Law 280 exempted the Menominees from its provisions. The House Reports on Pub. L. 280 (H. R. 1063, 83d Cong., 1st Sess.) and on Pub. L. 661 (H. R. 9821, 83d Cong., 2d Sess.) indicate that the Menominees had specifically asked for exemption from the provisions of the bill that eventually became Pub. L. 280, on the ground that their tribal law and order program was functioning satisfactorily. Subsequently, the tribe reconsidered its position and sponsored H. R. 9821, amending Pub. L. 280 to extend its provisions to the Menominee Reservation. The Department of the Interior recommended favorable action on the proposed amendment, and the amendment was enacted into law on August 24, 1954 (68 Stat. 795), two months after the passage of the Menominee Termination Act. See H. R. Rep. No. 848, 83d Cong., 1st Sess., 6 (1953); H. R. Rep. No. 2322, 83d Cong., 2d Sess. (1954).

Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute *with respect to hunting, trapping, or fishing* or the control, licensing, or regulation thereof." (Emphasis added.) That provision on its face contains no limitation; it protects any hunting, trapping, or fishing right granted by a federal treaty. Public Law 280, as amended, became the law in 1954, nearly seven years *before* the Termination Act became fully effective in 1961. In 1954, when Public Law 280 became effective, the Menominee Reservation was still "Indian country" within the meaning of Public Law 280.

Public Law 280 must therefore be considered *in pari materia* with the Termination Act. The two Acts read together mean to us that, although federal supervision of the tribe was to cease and all tribal property was to be transferred to new hands, the hunting and fishing rights granted or preserved by the Wolf River Treaty of 1854 [12] survived the Termination Act of 1954.

---

[12] The Act creating the Wisconsin Territory (5 Stat. 10) contained an express reservation of Indian rights, though both the Enabling Act of 1846 (9 Stat. 56), and the Act admitting Wisconsin to the Union in 1848 (9 Stat. 233) were silent on the subject. It was only a few months after Wisconsin achieved statehood that the Menominees ceded all of their Wisconsin lands to the United States in anticipation of the tribe's removal to other lands west of the Mississippi. Treaty of October 18, 1848, 9 Stat. 952. But as already noted, this removal never fully succeeded, and the Menominee Reservation created by the Treaty of Wolf River was carved out of the lands the Indians had previously ceded to the United States.

The State argues that since it was admitted into the Union on an equal footing with the original States, its sovereignty over the lands designated in 1854 as the Menominee Reservation attached in some degree between the time the Indians ceded all of their Wisconsin lands to the United States in 1848 and the time when the United States ceded back a certain portion of those lands for the reservation in 1854. Wisconsin contends that any hunting or fishing privileges

This construction is in accord with the overall legislative plan. The Termination Act by its terms provided for the "orderly termination of Federal *supervision* over the property and members" of the tribe. 25 U. S. C. § 891. (Emphasis added.) The Federal Government ceded to the State of Wisconsin its power of supervision over the tribe and the reservation lands, as evident from the provision of the Termination Act that the laws of Wisconsin "shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within [its] jurisdiction."

The provision of the Termination Act (25 U. S. C. § 899) that "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe" plainly refers to the termination of federal supervision. The use of the word "statutes" is potent evidence that no *treaty* was in mind.

We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians. While the power to abrogate those

---

guaranteed the Menominees free from state regulation did not survive the dissolution of the reservation and the termination of the trusteeship of the United States over the Menominees. At that time, it is said, Wisconsin's long dormant power to exercise jurisdiction over those reservation lands was awakened by the termination of the reservation.

If any hiatus in title to the reservation lands in question occurred between 1848 and 1854, any jurisdiction that the State may have acquired over those would not have survived the Treaty of 1854. The Treaty of Wolf River was, under Article VI of the Constitution, the "supreme law of the land," and the exercise of rights on reservation lands guaranteed to the tribe by the Federal Government would not be subject to state regulation, at least in absence of a cession by Congress. Cf. *Ward* v. *Race Horse*, 163 U. S. 504, 514. In this connection it should be noted that in 1853 the Wisconsin Legislature consented to the establishment of the Menominee Reservation subsequently confirmed by the 1854 Treaty (1853 Wis. Jt. Res., c. I),

rights exists (see *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 564–567) "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress." *Pigeon River Co.* v. *Cox Co.,* 291 U. S. 138, 160. See also *Squire* v. *Capoeman,* 351 U. S. 1.

Our conclusion is buttressed by the remarks of the legislator chiefly responsible for guiding the Termination Act to enactment, Senator Watkins, who stated upon the occasion of the signing of the bill that it "in no way violates any treaty obligation with this tribe." [13]

We find it difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation [14] by destroying property rights conferred by treaty, particularly when Congress was purporting by the Termination Act to settle the Government's financial obligations toward the Indians.[15]

Accordingly the judgment of the Court of Claims is

*Affirmed.*

Mr. Justice Marshall took no part in the consideration or decision of this case.

Mr. Justice Stewart, with whom Mr. Justice Black joins, dissenting.

By the Treaty of Wolf River in 1854, 10 Stat. 1064, the United States granted to the Menominee Tribe of

---

an action which can be fairly construed as a disclaimer of any jurisdiction the State may have possessed.

[13] 100 Cong. Rec. 8538.

[14] See n. 4, *supra.*

[15] Compare the hearings on the Klamath Termination bill, which took place shortly before the Menominee bills were reached, in which Senator Watkins expressed the view that perhaps the Government should "buy out" the Indians' hunting and fishing rights rather than preserve them after termination. See Joint Hearings, Subcommittees of the Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 4, on S. 2745 and H. R. 7320, pp. 254–255.

Indians a reservation "to be held as Indian lands are held." As the Court says, this language unquestionably conferred special hunting and fishing rights within the boundaries of the reservation. One hundred years later, in the Menominee Indian Termination Act of 1954, 68 Stat. 250, 25 U. S. C. §§ 891–902, Congress provided for the termination of the reservation and the transfer of title to a tribal corporation. The Act provided that upon termination of the reservation,

"[T]he laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 25 U. S. C. § 899.[1]

The reservation was formally terminated on April 30, 1961, seven years after the Termination Act, and the State of Wisconsin has ever since subjected the Menominees, just as any other citizens, to its hunting and fishing regulations. *State* v. *Sanapaw,* 21 Wis. 2d 377, 124 N. W. 2d 41.

The Menominees instituted this proceeding against the United States, asking compensation for the taking of their special rights. *Shoshone Tribe* v. *United States,* 299 U. S. 476. The Court of Claims denied compensation on the ground that the Termination Act had not in fact extinguished those rights, and that they remained immune from regulation by Wisconsin. The Court today agrees. I do not.

---

[1] The Termination Act was adopted in response to an earlier congressional resolution which stated in part:

"[I]t is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States . . . ." 67 Stat. B132.

The statute is plain on its face: after termination the Menominees are fully subject to state laws just as other citizens are, and no exception is made for hunting and fishing laws. Nor does the legislative history contain any indication that Congress intended to say anything other than what the unqualified words of the statute express.[2] In fact two bills which would have explicitly preserved hunting and fishing rights[3] were rejected in favor of the bill ultimately adopted[4]—a bill which was opposed by counsel for the Menominees because it failed to preserve their treaty rights.[5]

The Court today holds that the Termination Act does not mean what it says. The Court's reason for reaching this remarkable result is that it finds *"in pari materia"* another statute which, I submit, has nothing whatever to do with this case.

That statute, Public Law 280, 67 Stat. 588, as amended, 68 Stat. 795, 18 U. S. C. § 1162 and 28 U. S. C. § 1360, granted to certain States, including Wisconsin, general jurisdiction over "Indian country" within their bound-

---

[2] I cannot attach any significant weight to an offhand remark in a speech made by one Senator after the enactment of the bill. *Ante,* at 413.

It is, of course, irrelevant that the legislative history reveals no intention by the Congress to incur a financial obligation to the Menominees. If what the Congress did took away the Menominees' property rights, then regardless of congressional intent they are entitled to compensation from the United States for the taking.

[3] H. R. 7135 and S. 2813, 83d Cong., 2d Sess.

[4] H. R. 2828, 83d Cong., 2d Sess.

[5] "I think it is clear that [the bill] does affect those treaty rights and that those treaties are abrogated. Certainly it abolishes the tribal right to exclusive hunting and fishing privileges, because automatically upon the final termination date, the Menominee Reservation so far as hunting and fishing is concerned, would become subject to the laws of Wisconsin." Joint Hearings on S. 2813, H. R. 2828, and H. R. 7135, Subcommittees of Committees on Interior and Insular Affairs, 83d Cong., 2d Sess., Pt. 6, pp. 692, 708.

aries.[6]  Several exceptions to the general grant were enumerated, including an exception from the grant of criminal jurisdiction for treaty-based hunting and fishing rights.  18 U. S. C. § 1162 (b).  But this case does not deal with state jurisdiction over Indian country; it deals with state jurisdiction over Indians after Indian country has been terminated.  Whereas Public Law 280 provides for the continuation of the special hunting and fishing rights while a reservation exists, the Termination Act provides for the applicability of all state laws without exception after the reservation has disappeared.[7]

The Termination Act by its very terms provides:

"[A]ll statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe . . . ."  25 U. S. C. § 899.

Public Law 280 is such a statute.  It has no application to the Menominees now that their reservation is gone.[8]

---

[6] "Indian country" is defined in 18 U. S. C. § 1151 as land within Indian reservations, dependent Indian communities, and Indian allotments.

Public Law 280 as originally enacted in 1953, 67 Stat. 588, did not include the Menominee reservation.  In 1954 the statute was amended to include that reservation.  68 Stat. 795.  From that time until the reservation was terminated in 1961, Public Law 280 governed the extent to which the State could assert jurisdiction over the Menominees on their reservation.

[7] The only real relevance of Public Law 280 lies in its demonstration that when Congress wants to except treaty rights from jurisdictional grants, it knows how to do so.  Cf. Klamath Termination Act, 68 Stat. 718, 25 U. S. C. § 564 et seq., enacted by the same Congress that enacted the Menominee Termination Act, which explicitly preserves fishing rights.  25 U. S. C. § 564m (b).

[8] If, as the Court seems to say, the exceptions enumerated in Public Law 280 continue in effect after termination of Indian country, it follows that Wisconsin cannot now tax, or otherwise regulate the use of, property owned by the Menominees.  18 U. S. C. § 1162 (b); 28 U. S. C. § 1360 (b).  Cf. Snohomish County v. Seattle

The 1854 Treaty granted the Menominees special hunting and fishing rights. The 1954 Termination Act, by subjecting the Menominees without exception to state law, took away those rights. The Menominees are entitled to compensation.

I would reverse the judgment of the Court of Claims.

*Disposal Co.,* 70 Wash. 2d 668, 425 P. 2d 22, holding that Public Law 280 prohibits zoning regulation of a garbage dump on reservation land leased to non-Indians. Certiorari was denied, 389 U. S. 1016, MR. JUSTICE DOUGLAS, joined by MR. JUSTICE WHITE, dissenting.