**CONFEDERATED TRIBES OF the UMATILLA INDIAN RESERVA-TION, Plaintiff,**

v.

**Clifford L. ALEXANDER, Jr., Secretary of the Army of the United States, Lt. Gen. John W. Morris, Chief of Engineers, United States Army Corps of Engineers, Christopher J. Allaire, District Engineer, United States Army Corps of Engineers, Walla Walla District, Defendants.**

**Civ. No. 74–991.**

United States District Court, D. Oregon.

Nov. 10, 1977.

Douglas R. Nash, Pendleton, Or., Dennis J. Whittlesey, Washington, D.C., Daniel H. Israel, Boulder, Colo., for plaintiff.

Sidney I. Lezak, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., for defendants.

## OPINION

BELLONI, District Judge:

The United States Army Corps of Engineers plans to dam Catherine Creek, in Northeastern Oregon, for flood control, irrigation and recreation purposes. Plaintiff Confederated Tribes of the Umatilla Indian Reservation seek to enjoin construction of the dam, contending that it will infringe fishing rights guaranteed to them by the treaty of 1855 by which they ceded the bulk of their aboriginal lands to white settlers. Plaintiffs recognize that Congress has power to take such fishing rights. They main-tain, however, that Congress has not exercised that power in this case. The government replies that no treaty fishing rights exist on the relevant segment of Catherine Creek and that, even if such rights can be found, the Chinook hatchery planned as part of the project will sufficiently mitigate any adverse effects by increasing fish populations.

The controlling treaty language is similar to that found in most Northwest Indian treaties of the middle nineteenth century:

> . . . the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations . . .

Treaty of June 9, 1855, 12 Stat. 945. The significant difference between this and other similar treaties is that the off-reservation right to fish is secured only at "stations", not "grounds and stations". "Grounds" and "stations" have been held to convey distinct meanings as used in these treaties, the former including large areas where Indians had traditionally fished, the latter restricted to "fixed locations such as the site of a fish weir or a fishing platform or some other narrowly limited area;" *United States v. Washington,* 384 F.Supp. 312, 332 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir. 1975), *cert. denied* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97, *reh. denied* 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976).

█ In applying this definition of fishing stations to the facts of a particular case, the manner of fishing used by the Indians at the time of the treaty necessarily determines the extent and location of fishing stations. The evidence is clear in this case that the primary method of Indian fishing on Catherine Creek before 1855 was by spear or gaff. The fishermen would locate a hole, usually 30 or 40 feet long, in which salmon were likely to be found. Those wielding spears or gaffs would be stationed at one or both ends of such a hole while the others in the fishing party beat the banks so as to drive the salmon toward the shallow ends of the hole where they would be speared or gaffed.

The Indians camped at various sites along Catherine Creek and ranged up and down its length, fishing wherever they found holes which were likely to harbor salmon or steelhead. Certainly changes in the creekbed due to erosion and rockfall would alter the size, shape and location of such holes.

> The passage of time and the changed conditions affecting the water courses and the fishery resources in the case area have not eroded and cannot erode the right secured by the treaties . . .

*United States v. Washington, supra* at 401. Catherine Creek is particularly susceptible to natural changes in its bed. Amounts of water in the creek vary widely, depending mainly on the accumulation of snow available for melting. During Catherine Creek's 65 year recorded history, streamflows have fluctuated from five cubic feet per second (cfs) to 1740 cfs. In 1970 alone, flows ranged from about 40 cfs to over 800 cfs. Such conditions make the course of the creek and the topography of its bed unpredictable. Indeed it is partly for this reason that the Corps of Engineers project was authorized.

Given the evidence of these natural factors and the mobile character of the traditional Indian fishing on Catherine Creek, it is far more likely than not that pre-treaty fishing holes were located on the creek at places which the dam's 2½ mile reservoir will flood. I find that these holes were fishing stations, and treaty rights in them will be destroyed by the project.

■ Further, while the 1855 treaty spoke only of "stations", it is clear that the government and the Indians intended that all Northwest tribes should reserve the same fishing rights.

> It is designed to make the same provision for all the tribes and for each Indian of every tribe. The people of one tribe are as much the people of the Great Father as the people of another tribe; the red men are as much his children as the white men.

Isaac Stevens, Governor and Superintendent of Indian Affairs for the Washington Territory, in Treaty Minutes of June 5, 1855, *quoted in* E. G. Swindell, Report of Source, Nature & Extent of the Fishing, Hunting and Miscellaneous Related Rights of Certain Indian Tribes in Washington and Oregon 423 (1942). The fishing locations specifically found above are "stations", as distinguished from "grounds". If the evidence had not warranted a finding of fishing stations, it would have been appropriate to consider whether fishing *grounds* existed on the relevant sections of Catherine Creek. The proof at trial established, and I find, that the term "stations" in this particular treaty was intended to designate the same kinds of fishing locations as the phrase "grounds and stations" in the other Northwest Indian treaties.

■ Some of the Indian fishing stations on Catherine Creek will be inundated by the reservoir which the dam will create. These stations will be covered by as much as 200 feet of water. Such a flooding will deprive the Indians of their right to occupy the fishing stations and of their right to access for that purpose. *Cf. United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). I find unpersuasive the government's argument that 200 feet of water will not impair access to these traditional stations. The dam will also prevent all wild fish from swimming upstream. Chinook will be trapped and hauled above the dam to mitigate the loss, but the steelhead run will be eliminated entirely at all stations upstream from the dam. Whatever the merits of the government's mitigation program, the treaty right to fish at all usual and accustomed stations will be destroyed as to those stations within the reservoir.

■ In order to nullify treaty rights in this way, Congress must act expressly and specifically. *Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). The right to destroy Indian rights will not be inferred from a general project authorization such as that for this dam. Congress authorized this project in 1965 without knowing that the dam would affect treaty rights. The Corps of Engineers' first knowledge of the existence of fishing rights in the area came in

1972. Therefore, the Congress has not authorized the taking of Indian fishing rights for the Catherine Creek Project.

Since the dam would take treaty rights without proper authorization, plaintiffs are entitled to relief. They ask declaratory judgment and injunction. According to the evidence, actual construction of the dam, hence the actual taking of Indian fishing rights, is not planned for another two to three years. The situation thus appears to lack the urgency which ordinarily demands the drastic remedy of injunction. I therefore find it appropriate to issue a declaratory judgment in the following terms: Plaintiff Indians have usual and accustomed fishing stations on Catherine Creek. Some of these will be flooded, thus destroyed, by the construction of defendant's dam. The steelhead fishery above the dam will be destroyed. Specific congressional authority is required for such action by defendants, and none now exists.

It is expected that, without injunction, the Corps of Engineers will seek proper authority for their project.

The above constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).