**WASHINGTON STATE CHARTERBOAT ASSOCIATION, Plaintiff-Appellant,**

v.

**Malcolm BALDRIGE, Secretary of Commerce, Defendant-Appellee.**

No. 82–3115.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1983.

Decided March 29, 1983.

Daniel Syrdal, Carmody, Syrdal, Danelo & Klein, Seattle, Wash., for plaintiff-appellant.

Donald Carr, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BROWNING, Chief Judge, and FLETCHER and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

Appellant Washington State Charterboat Association is an organization of Washington State citizens who operate offices and vessels serving ocean sport anglers.

The Association brought this litigation to compel the Secretary of Commerce (Secretary) to revise the federal management plan for salmon fishing off the coast of Washington. Specifically, the Association seeks to substitute an "aggregate" approach for the "run-by-run" approach used by the Secretary to determine the portions of each North Pacific salmon harvest allocated to various Indian tribes under the federal plan. According to the Association, the run-by-run approach is not required by the treaties that established the Indians' fishing rights and is inconsistent with the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882 (Magnuson Act). These legal issues were argued to the district court on cross-motions for summary judgment. The district court granted summary judgment in favor of the Secretary. The Association appeals. We affirm.[1]

I

This action arises from a history of controversy between treaty and nontreaty fishers in Washington State over the division of fishing rights. See, e.g., S.Rep. No. 667, 96th Cong., 2d Sess. 2 (1980) U.S.Code Cong. & Admin.News 1980, p. 6793. Treaties negotiated by Governor Isaac Stevens between the United States and several Pacific Northwest Indian tribes in the 1850s established the rights of the treaty fishers.[2] In 1970 the United States, on its own behalf and as trustee of seven Indian tribes, initiated litigation to clarify the treaty fishers' rights. See United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974) ("final" decision) (Boldt, J.), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. Washington, 459 F.Supp. 1020, 1020–1130 (W.D.Wash.1974–1978) (post-trial decisions), various appeals dismissed, 573 F.2d 1117 (9th Cir.1978), 573 F.2d 1118 (9th Cir.1978), 573 F.2d 1121 (9th Cir.1978), various appeals aff'd sub nom. Puget Sound Gillnetters Association v. United States District Court, 573 F.2d 1123 (9th Cir.1978) (aff'g decisions at 459 F.Supp. at 1097–1118 (W.D.Wash.1977–78)), aff'd in part, vacated in part, and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (hereinafter Fishing Vessel). The litigation culminated in the holding that treaty fishers have a right to a share of each run of anadromous fish[3] that passes through the "usual and accustomed" Indian fishing sites. Fishing Vessel, 443 U.S. at 685, 99 S.Ct. at 3074.

This action represents at least the second effort of the Association[4] to challenge the

1. Summary judgment is appropriate where there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Lutcher v. Musicians Union Local 47, 633 F.2d 880, 882 (9th Cir.1980). Here, the parties agreed to the facts.

2. The United States entered into the treaties with the Indians to extinguish the last conflicting claims to lands lying west of the Cascade Mountains and north of the Columbia River in what is now Washington State. The treaty with amici (who are treaty fishers of the Quinault Indian Nation, the Hoh Indian Tribe, and the Quileute Indian Tribe) is the Treaty of Olympia, July 1, 1855, and January 25, 1856, ratified March 8, 1859, and proclaimed April 11, 1859, 12 Stat. 971. See United States v. Washington, 384 F.Supp. 312, 349 (W.D.Wash. 1974).

3. "Anadromous fish" are fish which are spawned or artificially produced in fresh water, reach maturity in the ocean, and then return to

their water of origin to spawn. See 384 F.Supp. at 405. A "run" is a group of anadromous fish on their return migration, identified by species, race, and water of origin. See id.

4. The Association tried to intervene in Hoh Indian Tribe v. Baldrige, 522 F.Supp. 683 (W.D. Wash.1981) (Craig, J.), in which amici in this appeal challenged the Secretary's 1981 harvest plan, seeking reductions in either the ocean harvest limits or Washington State's spawning escapement goals. When the Association appealed the district court's denial of its motion to intervene, this court held that the Association's challenge was foreclosed by the line of cases leading up to Fishing Vessel and by Fishing Vessel itself. Hoh Indian Tribe v. Baldrige, 676 F.2d 710 (9th Cir.1982) (memorandum) cert. denied, —— U.S. ——, 103 S.Ct. 141, 74 L.Ed.2d 120 (1982). The panel described the Association's effort as a "thinly-veiled" attempt to "relitigate issues that have previously been decided." Id.

Secretary's approach in allocating a portion of each annual harvest to treaty fishers.[5] The Association complains that the run-by-run approach forces the Secretary to call an early halt to each year's ocean harvest by nontreaty fishers to protect individual runs of the depressed species, viz., chinook and coho. (The chinook and coho are line-biting fish and are thus the salmon species of primary interest to the Association.) The Association cites, for example, the Secretary's plan for the 1981 ocean harvest off the coast of Washington. The plan provided for a commercial season from May 1 to May 31 for all salmon species except coho and for all species from July 15 to September 1, subject to closure whenever the coho harvest reached 372,000 fish. 46 Fed.Reg. 30,633, 30,641–42 (1981). The plan also provided for a recreational season from May 23 to September 7, with a daily bag limit of two salmon (three north of the Queets River, only two of which could be chinook or coho). This season was subject to closure whenever the harvest of coho reached 248,-000 fish. *Id.*

The Association contends in this appeal that the Secretary should use an aggregate approach that would give the region's treaty fishers roughly half of the *total* salmon harvest, i.e., half of the harvest of all species, including chum and sockeye. Under the Association's aggregate approach, treaty fishers would be compensated for loss of their usual stream-harvested share of the chinook and coho through an allocation of more than half of the chum and sockeye. According to the Association, an aggregate approach is permitted by the Stevens treaties and is required by the Magnuson Act. The Association argues alternatively that, if the Stevens treaties do not permit an aggregate approach, they have been, to that extent, abrogated by the Magnuson Act.

## II

▉ The Association's proposed aggregate approach is precluded by the treaties negotiated by Governor Stevens with the Indians. All of these treaties provide that "[t]he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . . ." Treaty of Medicine Creek, art. III, 10 Stat. 1133 (quoted in *Fishing Vessel,* 443 U.S. at 674, 99 S.Ct. at 3068). *Fishing Vessel* provides the controlling construction of this critical treaty provision. The Court there declared, "In our view, the purpose and language of the treaties are unambiguous; they secure the Indians' right to take a share of *each run* of fish that passes through tribal fishing areas." *Id.* 443 U.S. at 679, 99 S.Ct. at 3071 (emphasis added). The Court further held that the Indians' treaty share of each run is presumptively half but that this presumptive share should be reduced whenever tribal needs would be satisfied by a lesser amount. *Id.* at 685–86, 99 S.Ct. at 3074–75. Thus, the Indians' treaty share is a "fair share" of each run. *Id.* at 684, 99 S.Ct. at 3073.

The Association argues that by substituting a "fair share" for the fifty-fifty, treaty-nontreaty division of fish originally proposed by the district court in *United States v. Washington,* 384 F.Supp. 312, the Supreme Court somehow abandoned the run-by-run approach. Nothing in the Court's opinion supports this interpretation of *Fishing Vessel.* In discussing the very issue of the Indian's "fair share," the Court stated:

> We also agree with the Government that an equitable measure of the common right should initially *divide the harvestable portion of each run that passes through a "usual and accustomed" place into approximately equal treaty and nontreaty shares,* and should then reduce the

**5.** The relevant duties of the Secretary are set forth in the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882, which charges the Secretary with responsibility for establishing annual harvest plans for each ocean fishery consistent with the goals established by the Act. The goals include achieve-

ment of the "optimum yield" from each fishery, 16 U.S.C. § 1851(a)(1) (1976), and a fair allocation of fishing privileges among all United States fishers, *id.* § 1851(a)(4)(A). In addition, the Secretary must determine that each plan is consistent with "any other applicable law." *Id.* § 1854(b).

treaty share if tribal needs may be satisfied by a lesser amount.

*Fishing Vessel,* 443 U.S. at 685, 99 S.Ct. at 3074 (emphasis added).

The Association next contends that, because the line of cases leading up to *Fishing Vessel* addressed issues concerning fishing in the interior waters of Washington State and did not involve ocean waters under the jurisdiction of the United States, the Secretary must divide the harvest of fish as the Association proposes in order to achieve the Magnuson Act goal of the "optimum yield." 16 U.S.C. § 1851(a)(1) (1976). This argument ignores not only the physical realities of the salmon life cycle, viz., the fact that harvestable fish in ocean waters are the same fish that return to the streams of Washington State to spawn, but also the fact that the Court expressly included ocean catches in the allocation of fish. *Fishing Vessel,* 443 U.S. at 688, 99 S.Ct. at 3075.

The Association also asserts that the district court's orders in *United States v. Washington,* 384 F.Supp. 312, do not require run-by-run allocations of fish. The Association relies on various statements of the district court regarding the need for flexibility in allocating harvest shares to respond to special local circumstances. Contrary to the position of the Association, however, the district court clearly adhered to the right of each tribe to take a share of each run passing through tribal fishing sites as the regional rule of allocation. *Hoh Indian Tribe v. Baldrige,* 522 F.Supp. 683, 689 (W.D.Wash.1981). The Secretary and Washington State have been expressly invited by the district court to seek relief in that court whenever a departure from the usual rule is warranted by, among other concerns, the needs of nontreaty fishers.[6] *Id.*

The Association next argues that the run-by-run approach was treated in *Fishing Vessel* simply as a means of calculating the treaty fishers' overall harvest *share,* not as a rule for determining a "fair share" of

salmon that individual tribes could take from their "usual and accustomed" fishing sites. The Association's interpretation of the right to take fish "in common" is indistinguishable from the hypertechnical readings of treaty language that have been rejected by the Supreme Court. *See Fishing Vessel,* 443 U.S. at 675–78, 99 S.Ct. at 3069–3070.

In short, the Stevens treaties preclude adoption of an aggregate approach as the exclusive rule of salmon allocation.

### III

Finally, the Association maintains that the run-by-run approach diminishes the overall annual harvest and is, as a consequence, inconsistent with the Magnuson Act's "optimum yield" goal, 16 U.S.C. § 1851(a)(1) (1976). Therefore, the Association contends that, to the extent the Stevens treaties require a run-by-run approach, they were abrogated by the Magnuson Act.

Congress' intent to abrogate or modify an Indian treaty must be clear. *Menominee Tribe v. United States,* 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–1711, 20 L.Ed.2d 697 (1968). Such an intent may be found in the express provisions of an act or in its surrounding circumstances and legislative history. *United States v. Fryberg,* 622 F.2d 1010, 1016 (9th Cir.1980). There is, however, nothing in the language of the Magnuson Act or in its legislative history that even remotely suggests that Congress intended to abrogate or modify the Stevens treaties. On the contrary, the Magnuson Act expressly provides that each fishery management plan approved by the Secretary shall be consistent with all provisions of the Act and "any other applicable law." 16 U.S.C. § 1853(a)(1)(C) (1976). Such "other law" includes the Stevens treaties.

The purpose of the Magnuson Act was to protect United States fisheries by extending the exclusive fisheries zone of the United States from 12 to 200 miles and

6. Appellants may be able to reduce the impact of the run-by-run approach to some extent by agreement with the Secretary and the affected tribes or by application to the court for modification of the Secretary's plan. *See Hoh Indian Tribe v. Baldrige,* 522 F.Supp. at 690.

to provide for management of fishing within the 200-mile zone. H.R.Rep. No. 445, 94th Cong., 1st Sess. 21 (1975), *reprinted in* 1976 U.S.Code Cong. & Ad.News 593, 593–94. The extension of the zone indicates that Congress was concerned about harvests by foreign fishers, not catches by treaty fishers. Five years later, relying on the assumption that treaty fishers have a right to take a "fair share" of each annual harvest, Congress decided to assist nontreaty fishers by enacting the Salmon and Steelhead Conservation and Enhancement Act of 1980, Pub.L. No. 96–561, 94 Stat. 3275 (in part amending the Magnuson Act; codified in scattered sections of titles 15, 16 & 46). *See* H.R.Rep. No. 1243, 96th Cong., 2d Sess. 12, 28 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 6793, 6794, 6810.

The district court was correct in granting summary judgment in favor of the Secretary. The run-by-run approach for allocating salmon is required by the Stevens treaties and has not been abrogated by the Magnuson Act. Thus, we AFFIRM.