STATE OF MAINE                                    UNIFIED CRIMINAL DOCKET
WALDO, ss.                                        DKT. NO. WALCD-CR-16-636

STATE OF MAINE,                    )
                                   )
                                   )
                                   )    **ORDER DENYING DEFENDANT'S**
v.                                 )    **MOTION TO DISMISS**
                                   )
HENRY BEAR                         )

Defendant filed a Motion to Dismiss the State's prosecution, alleging a lack of both personal and subject matter jurisdiction over him based on aboriginal fishing rights retained by the Houlton Band of Maliseet Indians pursuant to the 1776 Treaty of Watertown. The Court held a hearing on April 26, 2017, at which the Defendant and Douglas Luckerman[1] testified. The Defendant offered four exhibits for admission, only two of which were admitted into evidence. Those exhibits admitted into evidence were L.D. 953 (126th Legis. 2013), titled "An Act To Provide for and Recognize the Right of the Houlton Band of Maliseet Indians To Fish for Marine Organisms," and H.P. 0395 (126th Legis. 2013), titled "Joint Resolution Acknowledging the Treaty of Watertown of 1776 on the Occasion of President George Washington's Birthday."

After extensive review of the parties' legal memoranda, the state Maine Implementing Act, the corresponding federal Maine Indian Claims Settlement Act, and the intricacies of the law pertaining to retained aboriginal hunting and fishing rights pursuant to treaties, the Court renders the following decision as to the pending Motion.

BACKGROUND

The pertinent facts which gave rise to this prosecution are straightforward and not in dispute. Defendant, a member of the Houlton Band of Maliseet Indian Tribe and the tribal

---

[1] The State and the Defendant stipulated to Mr. Luckerman's status as an expert on the Maine Implementing Act, the Maine Indian Claims Settlement Act, and the Treaty of Watertown.

1

representative for the Houlton Band in the Maine House of Representatives, is charged with Fishing After Elver Individual Fishing Quota Has Been Reached, in violation of 12 M.R.S. § 6575-K(2) (Class D). He was cited for exceeding his elver fishing quota of 6.01 lbs. by 0.01 lbs. while fishing for elvers near Head of Tide Road in Belfast on the Passagassawakeag River. It is not a matter of dispute that Defendant was fishing for elvers within the State of Maine's territorial jurisdiction and was not fishing for them on tribal lands or lands held in fee simple by any of Maine's tribes.

Defendant has challenged the State's jurisdiction to prosecute him, and the Court's jurisdiction to hear the case, based on the 1776 Treaty of Watertown between representatives from the State of Massachusetts Bay and the St. John's River Tribes and the Micmac Tribes.[2] He contends that the Treaty of Watertown reserved to the St. John's River Tribes, of which the Houlton Band of Maliseet derived, aboriginal hunting and fishing rights in what was then Massachusetts Bay and later became Maine upon its admission to the Union in 1820.

For its part, the State contends that any treaty rights retained by the Maliseet under the Treaty of Watertown were abrogated in 1980 when Congress explicitly subjected the Houlton Band of Maliseet "to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein," and released the State of Maine from any obligations arising from any treaties with nations, tribes, or bands of Indians in Maine. 25 U.S.C. §§ 1725(a), 1731.

LEGAL CONCLUSIONS

The impetus and history behind the enactment of the Maine Implementing Act (30 M.R.S. §§ 6201-6214 (2016)) ("MIA") and the corresponding Maine Indian Claims Settlement Act (25

---

[2] For the purposes of this Motion, the Court will assume the treaty was valid and that it conferred the rights asserted by Defendant.

2

U.S.C. §§ 1721-1735)[3] ("MICSA") has been recounted numerous times in both Maine courts and federal courts. *See, e.g., Aroostook Band of Micmacs v. Ryan*, 484 F.3d 41, 44-47 (1st Cir. 2007) ("*Aroostook II*"); *Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48, 53-55 (1st Cir. 2005) ("*Aroostook I*"); *Houlton Band of Maliseet Indians v. Me. Human Rights Comm'n*, 960 F. Supp. 449, 451-53 (D. Me. 1997); *Me. Houlton Band of Maliseet Indians v. Boyce*, 1997 ME 4, ¶¶ 9-10, 688 A.2d 908. Accordingly, the Court will only address the aspects of the MIA and MICSA relevant to the case at hand.

Pertinent to this matter is the status of the Houlton Band of Maliseet Indians under the MIA and MICSA. When enacting the MIA, the Legislature made its intent clear "that in contrast to the arrangement with the Passamaquoddy and the Penobscots, '[t]he Houlton Band . . . will be wholly subject to the laws of the State.'" *Aroostook II*, 484 F.3d at 45 (quoting 30 M.R.S. § 6202). Although the MIA did not extend benefits to the Houlton Band of Maliseet and the Houlton Band was not a party to the land settlement between the State, the Passamaquoddy, and the Penobscot, Congress did extend federal recognition to the Houlton Band of Maliseet and provided $900,000 in expenditures for a land acquisition fund to be held in trust for the Houlton Band of Maliseet.[4] *See* 25 U.S.C. §§ 1721, 1725(i), 1724(d)(1). Congress also made a point to state that it was ratifying the MIA. *Id.* § 1721(b)(3); *see also* S. Rep. No. 96-957, at 44 (1980) ("Under the

---

[3] MICSA was removed from the United States Code in 2016, but it is still legally valid. *See Editorial Reclassification—Title 25, United States Code, Office of Law Revision Counsel, U.S. House of Representatives*, http://uscode.house.gov/editorialreclassification/t25/index.html (last visited Feb. 13, 2018). All citations to MICSA will be as it was enacted within Title 25.

[4] A review of the relevant portions of the MIA's and MICSA's legislative history indicates that representatives from the State were well aware of the inclusion of the $900,000 as part of the land acquisition fund that would be used for the Houlton Band. While the State communicated with Congress about draft versions of MICSA—and it informed Congress of sections it was concerned would modify MIA—it considered the language regarding the land acquisition fund "sufficient and appropriate." Letter from Special Counsel for Maine Attorney General's Office to Cecil Andrus, Secretary of the Interior (July 21, 1980) (on file with the National Museum of the American Indian Archive Center, Smithsonian Institution); *see also* Memorandum from Timothy Woodcock to Senator William S. Cohen (July 21, 1980) (on file with the Raymond H. Fogler Library, Univ. of Me., Orono) ("The State does not object because [the portion of the land acquisition fund for the Maliseet] does not require alteration of the Maine Implementing Act and will not increase the size of 'Indian Country.'").

circumstances, the Committee believes the Maine Implementing Act should be ratified without modification.").

One important aspect of the enacted version of the MIA was the Legislature conditioning effectiveness of the MIA on Congress enacting legislation that "ratif[ied] and approv[ed] [the MIA] without modifications . . . ." P.L. 1979, c. 732, § 31. Defendant argues the provisions that Congress made for the Houlton Band of Maliseet in MICSA "modified" the MIA, meaning it never properly became effective. This is a proposition that this Court finds is not supported by the evidence or the analysis by other courts.

As indicated in footnote 4, *supra*, the State was not hesitant to inform Congress of possible revisions to drafts of MICSA that would require alteration of the MIA and ones that would not. Further, while the Law Court has not been presented directly with this issue, it has amply analyzed the MIA in relation to MICSA and has not seen fit to view the MIA as legally infirm. *See, e.g., Great N. Paper, Inc. v. Penobscot Nation*, 2001 ME 68, ¶¶ 28-37, 770 A.2d 574; *State v. Mitchell*, 1998 ME 128, ¶ 5, 712 A.2d 1033; *Penobscot Nation v. Stilphen*, 461 A.2d 478, 487 (Me. 1983) (internal citations and quotation marks omitted) ("The federal settlement act was predicated upon state legislation addressing the same topic which Congress expressly approved, ratified, and confirmed.").

Independent of the MIA, Congress explicitly provided that Maine law—such as the elver fishing quota law at issue here—would unequivocally apply to the Houlton Band of Maliseet. 25 U.S.C. § 1725(a) (emphasis added) (providing that "*all* Indians, Indian nations, or tribes or bands of Indians in the State of Maine, *other than the Passamaquoddy Tribe [and] the Penobscot Nation*, . . . shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or

4

land therein").

Because Defendant is relying on fishing rights he contends were reserved to him and his tribe pursuant to a treaty,[5] it is Congress that has the authority to speak on this issue. *S.D. v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."). In other words, if § 1725(a) of MICSA amounts to an elimination of treaty rights under Supreme Court precedent on the issue, then by Congress's explicit provision members of the Houlton Band of Maliseet would be subject to Maine's criminal laws—including 12 M.R.S. § 6575-K(2), whose legal validity is not challenged here—and the jurisdiction of its courts. Other cases interpreting MICSA, particularly § 1725(a), provide helpful guidance on this issue along with Supreme Court precedent on abrogation of native treaty rights.

In *Aroostook II*, the First Circuit analyzed the Aroostook Band of Micmacs' status under MICSA and the subsequently enacted state and federal settlement acts with respect to the Micmacs. Although the Micmacs were not originally part of the settlement, there are some useful parallels that can be drawn between the Micmacs and the Houlton Band because the State "gave the Aroostook Band a status similar to that accorded the Houlton Band, and different from the status given the Penobscots and Passamaquoddy." *Aroostook II*, 484 F.3d at 45-46. The Micmacs argued that Maine's employment laws were not applicable to them on the basis of tribal immunity they contended to have retained, similar to Defendant's argument that the elver fishing quota law is not applicable to him based on retained fishing rights.[6] Despite the Micmacs' absence from

---

[5] "[T]he reservation of rights doctrine holds that a treaty between the federal government and an Indian tribe is not a grant of rights to the Indians but, rather, a grant from them. In other words, the Indians ceded certain rights possessed by them at the time of making the treaty but reserved whatever rights were not expressly granted to the United States." *State v. Buchanan*, 978 P.2d 1070, 1078 (Wash. 1999) (citations omitted).

[6] The Court is cognizant of the heightened scrutiny given to abrogation of treaty rights as compared to abrogation of tribal sovereignty. Despite this, as will be discussed, the Court believes that MICSA not only abrogated the Micmacs'

consideration during the initial state and federal legislation in the late 1970s and 80s, the First Circuit found MICSA to be clear in subjecting the Micmacs to Maine law:

> In § 1725(a) it not only made Maine Indians "subject to . . . the laws of the State," and "subject to the civil and criminal jurisdiction of the State," but it expressly added the emphasizing phrase "to the same extent as any other person." And § 1725(a) not only applies to "Indians," but also to the "Indian nations, . . . tribes[, and] bands of Indians" themselves. Short of using "magic words," it is hard to imagine how § 1725(a) could have been clearer.

*Id.* at 50. The First Circuit also distinguished *Menominee Tribe of Indians v. U.S.*, 391 U.S. 404 (1968), from MICSA, which this Court will do in detail.

Defendant has offered *Menominee Tribe* to argue that MICSA cannot be considered to abrogate any reserved treaty rights. As the First Circuit found in *Aroostook II*, *Menominee Tribe* was distinguishable from the Micmacs status under MICSA. *Menominee Tribe* is also distinguishable from the case at hand, and arguably undercuts Defendant's argument. There, the treaty in question—the 1854 Treaty of Wolf River between Wisconsin, the U.S., and the Menominee Tribe—granted a reservation in Wisconsin to the Menominee Tribe which was "to be held as Indian lands are held." *Menominee Tribe*, 391 U.S. at 405-06. The Treaty of Wolf River was silent on the Menominee Tribe's hunting and fishing rights on that reservation of land.[7]

In 1954, Congress passed the Menominee Indian Termination Act ("MITA") which, among other things, ceased federal supervision over the Menominee Tribe and transferred all property held by the federal government for the tribe to the tribe. *Id.* at 408. Similar to § 1725(a) of MICSA, MITA further mandated that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." *Id.* at 410

---

tribal sovereignty with respect to enforcement of employment laws, but that it also abrogated any retained fishing rights held by the Houlton Band of Maliseet.

[7] The words "to be held as Indian lands are held" were generally considered to encompass hunting and fishing rights under a number of historic treaties. *See Menominee Tribe*, 391 U.S. at 406 n.2.

6

(internal quotation marks omitted). Wisconsin argued that this provision in MITA subjected the Menominee Tribe's hunting and fishing rights on the land ceded to the Menominee Tribe under the 1854 Treaty of Wolf River to state regulation and control.

However, the Supreme Court found it significant the Congress contemporaneously passed Public Law 280, which was ultimately codified at 18 U.S.C. § 1162. *Id.* at 411. Public Law 280 granted designated States, including Wisconsin, jurisdiction over offenses committed in "Indian country," but it also stated that "'[n]othing in this section . . . shall deprive any Indian or any Indian tribe, band, or community of any right . . . afforded under Federal treaty . . . *with respect to hunting, trapping, or fishing* or the control, licensing, or regulation thereof." *Id.* at 410-11. The Supreme Court determined that "Public Law 280 must therefore be considered *in pari materia* with the Termination Act." *Id.* at 411. Thus, while MITA subjected the Menominee Tribe to state jurisdiction, it did not abrogate the hunting and fishing rights the Menominee Tribe possessed on the lands ceded to it under the 1854 Treaty of Wolf River. Put another way, it required a contemporaneous statute passed by the same Congress exempting hunting, trapping, and fishing treaty rights on reservation land from state regulation in order to interpret MITA's jurisdictional application as not abrogating retained treaty rights. The Supreme Court's determination was further supported by "the legislator chiefly responsible for guiding the Termination Act to enactment, Senator Watkins, who stated upon the occasion of the signing of the bill that it 'in no way violates any treaty obligation with this tribe.'" *Id.* at 413 (citation omitted).

Here, there is no contemporaneously passed federal statute to be considered *in pari materia* with MICSA comparable to Public Law 280 that would indicate implicit hunting and fishing rights under a treaty are retained.[8] Nor is there the sort of statement in the legislative record that the

---

[8] Notably, the retained hunting and fishing rights the Supreme Court found in the Menominee Tribe were specifically in relation to the land ceded to the Menominee Tribe under the 1854 Treaty of Wolf River. The Court did not go so

7

Supreme Court found useful in *Menominee Tribe*. MICSA explicitly states that the Houlton Band of Maliseet Indians "shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein." 25 U.S.C. § 1725(a).

Further, while "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress," *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.*, 291 U.S. 138, 160 (1934), Congress does not have to explicitly state it is abrogating particular treaty rights; use of an explicit statement is not "a per se rule . . . ." *U.S. v. Dion*, 476 U.S. 734, 739 (1986). Instead, "where the evidence of congressional intent to abrogate is sufficiently compelling, the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." *Id.* at 739-40 (internal citation omitted). Absent an explicit statement, "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty" can show an abrogation. *Id.* at 740. Here, there is compelling evidence that Congress was aware of the effect its actions would have on retained hunting and fishing rights. Nonetheless, Congress still decided to treat the Houlton Band of Maliseet differently under MICSA than the Passamaquoddy and Penobscot by subjecting the Houlton Band to Maine law. *See* 25 U.S.C. § 1725(a).

There are a number of statements in the Senate Report that demonstrate Congress's intent to implement the State's differing treatment of Passamaquoddy and Penobscot from the Houlton

---

far as to say that the Menominee Tribe retained hunting and fishing rights across the entire State of Wisconsin; the Tribe only retained those rights on the reservation land pursuant to the Treaty. Here, the Treaty of Watertown did not create any sort of reservation in the then-State of Massachusetts Bay for the St. John's Tribe to which hunting and fishing rights could be in question. If anything, it created a mutual defense obligation. Further, the location of Defendant's alleged violation was not on any land acquired within the State of Maine for the Houlton Band of Maliseet Indians pursuant to 25 U.S.C. § 1724(d)(4); the alleged violation occurred on the Passagassawakeag River near Head of Tide Road in Belfast, which is not disputed to be State of Maine territorial jurisdiction.

8

Band, and that further demonstrate Congress's unequivocal intent to subject the Houlton Band wholly to the laws and jurisdiction of the State. For instance, in response to a concern about the sovereignty of the Passamaquoddy and Penobscot, the Senate Report noted that "[t]he settlement also protects the sovereignty of the Passamaquoddy Tribe and the Penobscot Nation in other ways," and gives retained hunting and fishing rights on tribal reservations as an example. S. Rep. No. 96-957, at 14-15 (1980). The Senate Report details no equivalent protection of sovereignty for the Houlton Band.

Additionally, Congress fully intended to implement the settlement agreement between the State and the tribes, which ensured "that the Passamaquoddy Tribe and the Penobscot Nation will retain as reservations those lands and natural resources which were reserved to them in their treaties with Massachusetts and not subsequently transferred by them." *Id.* at 18. This reference to natural resources being reserved to the Passamaquoddy and Penobscot in their treaties with Massachusetts is strong evidence that Congress was well aware of the reservation of rights doctrine, and only intended for it to apply on Passamaquoddy and Penobscot reservation land.[9] There is no similar reference to the Houlton Band retaining hunting and fishing rights pursuant to treaties with Massachusetts. On the contrary, the Senate Report reinforces the Houlton Band's subjection to State of Maine law and jurisdiction.

The Senate Report's analysis of subsection 6(a) (what was codified at 25 U.S.C. § 1725(a)) clearly explains "that except for the Passamaquoddy . . . [and] Penobscot . . . , all Indians, Indian nations, or tribes or bands of Indians and their lands or natural resources, shall be subject to the laws of the State of Maine." *Id.* at 26. While the Senate Report does note specific exceptions for the Houlton Band in subsection 5(d)(4) (25 U.S.C. § 1724(d)(4)) and subsection 6(e)(2) (25 U.S.C.

---

[9] In both the MIA and MICSA, "natural resources" is defined to include "hunting and fishing rights." 25 U.S.C. § 1722(b); 30 M.R.S. § 6203(3).

9

§ 1725(e)(2)), they are narrow and relate only to jurisdictional issues on lands acquired pursuant to the land acquisition fund and held in trust for the Houlton Band. *See id.* at 24, 26, 29. These narrow exceptions do not apply outside of the context of land acquired pursuant to the land acquisition fund in MICSA. Otherwise, only the Passamaquoddy and Penobscot receive "original" treatment in the sense that they are accorded similar status to municipalities. *Id.* at 29. Further, MICSA provides U.S. consent to amendment of the MIA's provisions regarding the enforcement of civil, criminal, and regulatory laws within the State's jurisdiction with respect to the Passamaquoddy and Penobscot only. *See* 25 U.S.C. § 1725(e)(1). The Houlton Band is notably absent from this provision allowing amendment of the MIA relating to the application of laws to the Passamaquoddy and Penobscot within the State's jurisdiction.

Taken together with the other provisions of MICSA and the related references in the Senate Report, the result is a federal statute that makes its intent explicit that the Houlton Band and its members would be completely subject to the application and enforcement of Maine criminal laws, such as the elver fishing quota at issue here, within the State's territorial jurisdiction. While there is no explicit statement concerning an abrogation of the Houlton Band of Maliseet's retained fishing rights within MICSA or the legislative history, the inescapable conclusion is that Congress intended the Houlton Band to be wholly subject to Maine's laws, irrespective of any previously retained hunting or fishing rights. Accordingly, the Court must deny Defendant's Motion.

The entry is:

1. Defendant's Motion to Dismiss is **DENIED**.
2. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R.U. Crim. P. 53(a).

Dated: 2/26/18

_____
The Hon. Robert E. Murray
Justice, Maine Superior Court

10